**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,**

v.

**AMERICAN ECONOMY INSURANCE COMPANY, Defendant.**

**No. CIV–90–323–A.**

United States District Court, W.D. Oklahoma.

Sept. 28, 1990.

Tom E. Mullen, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., for plaintiff.

Ronald L. Walker, Connie M. Bryan, McKinney, Stringer & Webster, P.C., Oklahoma City, Okl., for defendant.

## ORDER

ALLEY, District Judge.

Before the Court are cross-motions for summary judgment, and each party has responded to the other's motion. After review of the relevant law and briefs of counsel, the Court now partially grants plaintiff's motion and denies defendant's motion for the following reasons.

Background

This lawsuit stems from an underlying case that was settled. Plaintiff paid $1,500,000 to Bill and Joann Russell, who were injured when a horse trailer came loose from a Chevy Blazer driven by Jesse Clement. The Blazer was owned by Riffel–Roberson, a professional corporation. The

Russells sued Clement (among others), and plaintiff settled for the $1,500,000 figure.[1]

At the time of the accident, Clement was insured by two of plaintiff's policies and one of defendant's. Plaintiff's first policy has limits of $500,000 and is agreed by the parties to be primary. That policy is therefore not in dispute, and the issue is the priority between plaintiff's second policy and defendant's policy.

Defendant's policy has limits of $300,000 liability for any auto that Clement drives. The "other insurance" clause of defendant's policy makes the insurance primary if Clement drives a car he owns, but excess if Clement drives a car he does not own, as he was when the Russells were injured. This policy states that when it covers on the same basis as another policy, it will pay its share on a determined proportionate basis. Defendant's policy contains provisions for other auto-related coverage such as uninsured motorist, collision, and comprehensive coverage. The annual premium for this policy from September 1, 1987 to September 1, 1988 was $8,651.00.

Plaintiff's second policy is titled "Excess Blanket Catastrophe Liability Policy," and has limits of $2,000,000, with a retained limit of $10,000 and an annual premium of approximately $2,800. The catastrophe policy requires maintenance of underlying insurance and insures against ultimate net loss in excess of the stated retained limit. Besides personal injury, the catastrophe policy also covers property damage and "advertising injury," which is defined to include libel, slander, defamation, infringement of copyright, title or slogan, piracy, unfair competition, idea misappropriation or invasion of rights of privacy, arising out of the insured's advertising activities. This policy has an "other insurance" clause providing that the policy is excess if any other collectible insurance is available, and that the policy will not contribute with any other insurance.

Plaintiff's position is that its policy is a true umbrella or excess policy and should be third in order, and that an "excess clause" in an otherwise primary policy such as defendant's cannot defeat the true nature of an excess policy such as plaintiff's. In response, defendant argues that plaintiff's policy is "closer to the risk" because it insured an owned vehicle, while defendant's policy insured a non-owned vehicle. In the alternative, defendant argues that it should only pay a pro rata share if the Court determines the excess clauses in defendant's policy and plaintiff's second policy are mutually repugnant.

Defendant further argues that the legal basis for plaintiff's claim is equitable subrogation, which should be barred due to plaintiff's conduct in the settlement of the underlying case and plaintiff's voluntary payment of the full amount of the settlement.

Plaintiff responds that its claim sounds in contract and that defendant is estopped from asserting its defenses because defendant attended the settlement conference, did not object to settlement, and because the dispute as to priority of the policies was reserved. Plaintiff further responds that the "underlying conduct" issue is irrelevant, and that its voluntary payment was made in the best interest of its insured, Jesse Clement.

Discussion

■ The Court first addresses the theory of the case. Plaintiff claims the case sounds in contract, and defendant claims it is an equitable subrogation matter. Plaintiff cannot seriously argue that it has a contractual relationship with defendant though, because there has been no agreement, whose breach is sought to be remedied. The Court agrees with defendant that the matter is essentially equitable and in the nature of subrogation or contribution. Although the Complaint does not specify or otherwise indicate the plaintiff's theory,

1. Plaintiff states that it paid only $1,000,000 on behalf of Clement and $500,000 on behalf of William Roberson, a passenger in the Blazer who shared driving responsibilities with Clement on their trip. The Court does not consider how plaintiff allocated $1,000,000 of the $1,500,000 to Clement, but reserves that issue for trial as an aspect of the reasonableness of the settlement.

the nature of the action is equitable because it requires the Court to determine the rights of the parties *inter se.* This does not mean, however, that there are no fact questions, as will be discussed further.

Priority of the Policies

 There is no dispute between the parties that their respective policies were in effect and provided coverage to Jesse Clement at the time of the accident. The only dispute is a legal one as to which policy should pay second after plaintiff's primary policy, and then which should pay third. Thus, the priority issue is ripe for summary judgment because there is no disputed issue of fact as to the policies themselves, but only as to priority.

The parties have stipulated that Arkansas law applies, but neither the parties nor the Court have been able to find Arkansas cases that would either be dispositive or provide direction on these specific facts. The Court must therefore attempt to determine what the Arkansas courts would do with what appears to be a case of first impression. The Court is guided by recent case law from other jurisdictions, as well as by the oft-quoted treatise *Insurance Law and Practice* by Appleman.

True excess coverage policies carry the various names of excess, blanket, umbrella, catastrophe and the like. "[T]hese are policies of insurance sold at comparatively modest cost to pick up where primary coverages end, in order to provide an extended protection. . . . It should be noted that these policies often provide a primary coverage in areas which might not be included in the basic coverage, since it is the intent of the company to afford a comprehensive protection in order that such peace of mind may truly be enjoyed. This may, and usually does, include such coverages as protection against liability for libel, slander, false arrest, false imprisonment, invasion of privacy and malicious prosecution. . . . [T]his involves no attempt upon the part of a primary insurer to limit a portion of its risk by describing it as 'excess,' nor the employment of devices to escape responsibility. Therefore, umbrella coverages, almost without dispute, are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses." 8A Appleman, *Insurance Law and Practice* § 4909.85 (1981).

Several recent cases have relied on Appleman's position for authority when determining that a true umbrella policy comes last and should not be prorated. In *Occidental Fire and Casualty Co. v. Brocious,* 772 F.2d 47 (3d Cir.1985), the court juggled three policies. Two were issued by Buckeye Union Insurance Co. The first Buckeye policy had limits of $1,000,000 and provided excess coverage where the covered vehicle was not owned by the insured. Buckeye's other policy had limits of $20,-000,000 and stated that if the loss was covered by other valid and collectible insurance, the policy would be in excess of and would not contribute with other such insurance. The third policy, from Occidental, was found to have an excess clause that was repugnant with Buckeye's excess clause, and so the policies were to be prorated. The district court did not specify, though, whether the two Buckeye policies were to be added together for the proration.

The Third Circuit examined the second Buckeye policy with limits of $20,000,000 and concluded that it was a true umbrella policy that should not be prorated. 772 F.2d at 53. The court relied on the fact that the policy was not an attempt by a primary insurer to avoid coverage or to limit risk. Further, the Buckeye umbrella policy had different language in its "other insurance" clause from either the $1,000,000 Buckeye policy or the Occidental policy. As support, the Third Circuit relied on Appleman's reasoning in the above-quoted passage.

The court concluded that "[a] number of cases have given effect to the different language of the umbrella policy and its underlying purpose by holding that primary policies or policies with excess clauses must be exhausted before the carrier of an umbrella policy is required to pay." 772

F.2d at 54 (citations omitted). Other courts have followed *Brocious'* lead in *Aetna Casualty and Surety Co. v. United Services Automobile Assn,* 676 F.Supp. 79 (E.D.Pa. 1987) and *Home Insurance Co. v. Liberty Mutual Ins. Co.,* 678 F.Supp. 1066 (S.D.N. Y.1988).

In *Aetna,* the Pennsylvania district court was faced with a fact scenario closer to the one at hand. Aetna had two policies of insurance, one with limits of $250,000 and one with limits of $1,000,000. USAA had one policy with limits of $300,000. The parties agreed that Aetna's $250,000 policy was primary, but USAA argued that Aetna's second policy for $1,000,000 was not an umbrella policy and should have been prorated with USAA's $300,000 policy.

After reviewing *Brocious* and the pertinent sections from Appleman, the court concluded that the Aetna policy was indeed an umbrella or true excess policy, based on several factors. First, the policy provided the named insured with extended coverage for a relatively low premium. Second, the policy was labeled "excess indemnity policy." Third, the named insured was required to maintain underlying primary insurance. Fourth, the policy provided coverage in excess of the insured's homeowners, recreational vehicle, and watercraft insurance, in addition to his car. 676 F.Supp. at 81. The umbrella policy was therefore not prorated, and it paid only after the USAA policy had been exhausted.

The New York district court reached a similar conclusion in *Home Ins. Co.,* where it determined the priority of three policies. Liberty Mutual Insurance Co. provided a policy with limits of $1,000,000 to Bassett Furniture Industries, Inc.; Liberty also provided a policy with limits of $2,000,000 to J.C. Penney, Co. Home Ins. Co. provided an umbrella policy with limits of $20,000,-000 to Bassett. When Bassett and Penney became liable on a judgment due to an infant's injury in a crib, Liberty contributed the limits of its Bassett policy but refused to contribute on the Penney policy. Home contributed the remainder in order to settle the underlying litigation. Home then sued Liberty to force it to contribute the limits

of the Penney policy before Home was required to contribute.

Relying on *Brocious* and Appleman (as well as other authority), the court found that the Home umbrella policy was "not required to contribute to the settlement until all other applicable policies have been exhausted, regardless of the wording of those policies' 'other insurance' clause." 678 F.Supp. at 1069. The court paid special attention to the fact that Bassett had paid Home a premium of only $14,600 for the $20 million policy.

*Allstate Insurance Co. v. Employers Liability Assurance Corp.,* 445 F.2d 1278 (5th Cir.1971), a case cited by both parties, reached a similar result. The court had before it four policies, one of which was agreed to be primary. The court then arranged the priorities of the three remaining policies. Allstate and USF & G had policies with "other insurance" clauses, stating that coverage was excess as to non-owned vehicles. Employers had a policy in effect that was denominated "Umbrella Policy," covering a number of businesses and extending nine different types of liability coverage. The Employers policy used language of "ultimate net loss" and required maintenance of underlying insurance. The court found Employers to be a true excess or umbrella policy because Allstate and USF & G had issued what were essentially primary policies, "although, insofar as is pertinent to the covered occurrence here involved, they promised their insured only secondary or excess coverage." 445 F.2d at 1283. After considering the language of all three policies, the purpose for their purchase, and the context, the court concluded that "[w]hen insuring claims simply cannot be resolved by word-logic, courts should determine whether coverage priorities can be allocated in the light of total policy-insuring intent." 445 F.2d at 1284. The intent determined by the court in *Allstate* was that the Employers policy be an excess policy that would not contribute prorata with underlying primary policies containing excess clauses for non-owned vehicles.

Defendant attempts to distinguish *Allstate* by arguing that plaintiff's excess poli-

cy is not always secondary because it does cover some losses not covered by other policies. The fact that plaintiff's policy covers libel and slander does not convert it from a true excess policy into a primary policy though, because libel and slander are precisely the types of primary coverage included in many excess policies, and the Court is cited to no impediment to its decision that a policy can be excess as to some but not all of its coverage. Defendant also argues that the Employers policy in *Allstate* had no prorata clause, as does plaintiff's policy. However, the pro rata clause in plaintiff's policy is construable as applying to coverage that is primary to that policy, such as libel and slander, or when there is another true excess or umbrella policy in existence.

Defendant places great weight on and urges the Court to adopt the priorities found in *Unigard Ins. Group v. Royal Globe Ins. Co.*, 100 Idaho 123, 594 P.2d 633 (1979). There, Royal Globe had a primary policy with limits of $100,000 and a second policy with limits of $1,000,000. The second policy had an "other insurance" clause stating the policy would not contribute if there was other valid and collectible insurance. Unigard had a policy with limits of $500,000 with a clause that made its coverage excess as to a nonowned automobile. With little explanation as to its reasoning, the Idaho court found that the policies were not in conflict and that their language clearly set out their priorities. Royal Globe's primary policy paid first, the Royal Globe $1,000,000 policy paid second, and Unigard paid third. The court did not examine whether there was a requirement in Royal Globe's $1,000,000 policy that underlying insurance be maintained, or the size of the premium paid for the $1,000,000 coverage. Even assuming that the Idaho court considered those factors, this Court finds the above cited cases and the position taken by Appleman to be the better reasoned and the better public policy.

Plaintiff's excess policy is obviously meant to be of the umbrella type. It requires the insured to maintain underlying insurance, and the premium is quite modest when compared to plaintiff's policy that is admittedly primary, or to defendant's policy. Both plaintiff's $500,000 policy and defendant's $300,000 policy are intended to be primary, but contain the standard excess clauses relative to non-owned vehicles. As illustrated in the cases discussed above, the trend in the law is to read true excess policies for what they are, regardless of their name and regardless of excess clauses found in primary policies that attempt to limit risk by proration with true excess policies. When viewed in this manner, it is clear to this Court that plaintiff's excess policy should not be touched until defendant's policy's limits have been exhausted. Stated another way, plaintiff's primary policy is first, defendant's policy is second, and plaintiff's excess policy is third, with no proration among or between the policies.

■ In defense to plaintiff's motion for summary judgment, defendant claims plaintiff is estopped due to (1) plaintiff's voluntary payment of the full amount of the settlement and (2) plaintiff's misconduct in the underlying case. Although plaintiff paid the entire amount to settle the lawsuit, the release between plaintiff and the Russells assigned to plaintiff their causes of action against defendant. The public policy of settling cases and allowing injured parties to be compensated is very strong. Thus, "payment by an insurer which properly undertakes a burden of settlement or defense does not render it a volunteer, not entitled to recover." *Midwest Mutual Ins. Co. v. Indiana Ins. Co.*, 412 N.E.2d 84 (Ind.Ct.App.1980). Any other principle would leave insureds and injured persons without compensation while corporate insurance carriers litigate their disputes. The Court cannot countenance such an approach, and will not find an insurer to be a volunteer when it settles a lawsuit and then looks to another insurer for subrogation or contribution.

■ The Court agrees with plaintiff that defendant's argument about plaintiff's alleged misconduct in the Russell litigation is irrelevant. At issue is the contractual relationship each insurer has with its insured and the legal relationship the three policies

have with each other. Any relevance such conduct might have would go only to the reasonableness of the entire settlement, and not to whether plaintiff is barred from asserting its claim. The ruling on admissibility of the underlying conduct is premature and reserved for trial.

As alluded to above, summary judgment in plaintiff's favor is precluded by the remaining issue whether plaintiff's settlement was in fact reasonable. "In determining ... [reasonableness], the trier of the fact may consider the proportion of the total coverage afforded by the settling carrier, the presence or absence of notice to other carriers, and the discussions among the carriers, in addition to the evaluation of liability and damage issues." *State Farm Mutual Automobile Ins. Co. v. MFA Mutual Ins. Co.,* 671 S.W.2d 276 (Mo.1984). The reasonableness issue will also encompass plaintiff's allocation of $1,000,000 of the $1,500,000 paid to the Russells.

Plaintiff's motion is granted insofar as it has argued the priorities of the policies, but a question of fact remains, namely, whether plaintiff's settlement was reasonable, and if not reasonable, what a reasonable settlement would have been. Defendant's cross-motion for summary judgment is denied.

It is so ordered.