2004 VT 93

## Fireman's Fund Insurance Company v. CNA Insurance Company and Sumitomo Marine Management (USA), Inc.

[862 A.2d 251]

No. 03-035

Present: Amestoy, C.J.,[1] Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed September 17, 2004

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

216

*Robert Reis, John C. Holler* and *Matthew D. Anderson* of *Webber, Reis, Holler & Urso, LLP*, Rutland, for Plaintiff-Appellant/Cross-Appellee.

*Kaveh S. Shahi* of *Cleary Shahi Associates, P.C.*, Rutland, for Defendant-Appellee/Cross-Appellant CNA Insurance Co.

*William D. Riley* of *Paul Frank & Collins*, Burlington, and *Richard H. Nicolaides, Jr.* and *Nina Markoutsis* of *Bates & Carey*, Chicago, Illinois, for Defendant-Appellee Sumitomo Marine Management, Inc.

¶ 1. **Dooley, J.** Plaintiff Fireman's Fund Insurance (Fireman's) appeals, and defendant CNA Insurance Company (CNA) cross-appeals, from a Rutland Superior Court order denying in part and granting in part the parties' motions for summary judgment. In the superior court, Fireman's brought a declaratory judgment action to determine the priority of coverage for three insurance policies, issued respectively by Fireman's, CNA, and Sumitomo Marine Management (USA), Inc. (Sumitomo). Each of the policies provides some degree of coverage for injuries resulting from the automobile accident that is the subject of several underlying lawsuits. The accident involved two passenger vehicles and a tank tractor truck owned by Pouliot and

Corriveau, Inc. (P&C) that was pulling a milk tank "pup" trailer leased from Agri-Mark, Inc. (AMI). CNA[2] was the primary insurer for both P&C and its driver, Burton Heath, with Sumitomo providing a commercial excess umbrella policy for these insureds. Fireman's was AMI's primary carrier. Pursuant to the declaratory judgment action, the trial court found that Fireman's and CNA shared primary coverage responsibility for any claims against P&C, Heath, and AMI and that in the event that these two policies were exhausted, Sumitomo had coverage responsibility for any excess liability against the three parties. We affirm in part, and reverse and remand in part.

¶ 2. This case arises out of an automobile accident that occurred on June 1, 1997 on Route 7 near the village of Brandon. On that date, Ronald Gilligan was driving south on Route 7 with his wife, daughter and his daughter's friend in the car. Gilligan attempted to pass a minivan driven and occupied by members of the Clodgo family. When Gilligan pulled into the northbound lane to pass, he ran head-on into the oncoming P&C truck, driven by P&C's employee Heath. At the time of the accident, the truck was hauling a trailer owned by AMI and leased by P&C pursuant to an oral lease between the two parties. All four occupants of the Gilligan vehicle were killed, and members of the Clodgo family were injured.

¶ 3. After the accident, several lawsuits were filed against P&C, Heath, and AMI. The suits claimed that Heath was negligent in the operation of the truck and that both P&C and AMI were responsible for his negligence under respondeat superior. One suit against AMI, filed by the estate of a passenger in the Gilligan vehicle, alleged that the "pup" trailer was unreasonably dangerous and not suitable for the purpose for which it was being used. Gilligan's insurer paid out its policy limit of $300,000, which the various claimants shared. Fireman's has been defending AMI in these suits, but has not defended or contributed to the defense of Heath or P&C. Similarly, CNA has been defending Heath and P&C, but has not provided a defense for AMI. The Clodgo family settled its action against Heath and P&C after these lawsuits were filed.[3] The settlement agreement provides that if

---

[2] The issuing company was Transcontinental Insurance Company. CNA is Transcontinental's successor in interest.

[3] According to the declaratory judgment complaint, the Clodgos filed only one suit. CNA's motion for summary judgment references only one Clodgo suit, and the complaint is attached. The complaint indicates that the suit is only against P&C and Heath. The settlement agreement, which was attached to CNA's reply memorandum in support of its summary judgment motion, states that this action against P&C and Heath will be

CNA is able to recover any sums from Fireman's for contribution or reimbursement, CNA will pay the Clodgos one-third of the recovery up to $25,000.

¶ 4. In the aggregate, significant policy coverage is available for satisfaction of any judgments or settlements that may result from the claims. Both the CNA and Fireman's policies provide $1 million of auto liability coverage, and Sumitomo's commercial excess umbrella policy has a limit of $2 million. Our responsibility, as was the superior court's, is to establish the coverage priorities among the policies before us.

¶ 5. All parties to the declaratory judgment action moved for summary judgment. Fireman's urged the court to find that it is obligated to provide defense and indemnification for the insureds only upon the exhaustion of both the CNA and Sumitomo policies. In contrast, CNA argued that it shares primary coverage with Fireman's for liability for P&C and Heath, and that Fireman's alone provides coverage for AMI's liability. Sumitomo, in turn, asserted that CNA and Fireman's are primary for P&C's and Heath's liability and that Fireman's is also primary for AMI's liability. According to Sumitomo, it is obligated to provide coverage only for P&C and Heath, and only then after both CNA's and Fireman's policies are exhausted.

¶ 6. After considering the parties' motions for summary judgment, the court issued an order and made the following rulings: (1) Sumitomo's motion was granted "insofar as the CNA and Fireman's policies must be exhausted before Sumitomo must contribute to the coverage of P&C, Heath and AMI," but was denied "insofar as it sought to avoid responsibility for claims arising from Heath and AMI"; (2) CNA's motion was granted "insofar as Fireman's must share primary responsibility for the P&C and Heath claims," but was denied "insofar as it sought to escape liability for claims arising from Heath and AMI liability"; and (3) Fireman's motion was granted "insofar as CNA must share primary responsibility with Fireman's for claims arising from P&C's, Heath's and AMI's liability," but denied "insofar as it sought to avoid primary responsibility for any claims."

¶ 7. Following the issuance of the order, Fireman's filed an appeal with this Court, and CNA cross-appealed. Thereafter, Sumitomo withdrew from the appeal. This withdrawal has little effect on this opinion because we still must address Fireman's arguments on the

dismissed with prejudice. Despite the fact that the Clodgos never sued AMI, the settlement agreement releases AMI from liability.

priority of coverage responsibilities with respect to all three carriers. On appeal, Fireman's contends that it is excess over both the CNA and Sumitomo policies. CNA cross-appeals, arguing that Fireman's shares primary coverage responsibility for P&C and Heath and that it provides no coverage for AMI even though AMI is a listed as an additional insured.

¶ 8. We review the decisions on the parties' summary judgment motions using the same standard as the trial court. *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 309, 683 A.2d 386, 389 (1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." V.R.C.P. 56(c)(3). We will take as true the facts alleged by the nonmoving party, and "give the nonmoving party the benefit of all reasonable doubts and inferences." *Chamberlain v. Metro. Prop. & Cas. Ins. Co.*, 171 Vt. 513, 514, 756 A.2d 1246, 1248 (2000) (mem.). Here, our inquiry largely turns on the policies' language. Construction of the language of insurance contracts is a question of law, not of fact. *Waters v. Concord Group Ins. Cos.*, 169 Vt. 534, 535, 725 A.2d 923, 925 (1999) (mem.). Accordingly, we make our own inquiry into the legal effect of the contracts' terms and the relationships between them. *Gannon v. Quechee Lakes Corp.*, 162 Vt. 465, 469, 648 A.2d 1378, 1380 (1994).

¶ 9. We interpret insurance contracts according to their terms and the intent of the parties as expressed by the policies' language. *City of Burlington v. Nat'l Union Fire Ins. Co.*, 163 Vt. 124, 127, 655 A.2d 719, 721 (1994). "Disputed terms are to be read according to their plain, ordinary and popular meaning." *Chamberlain*, 171 Vt. at 514, 756 A.2d at 1248. Any ambiguity will be resolved in the insured's favor, but we will not deprive the insurer of unambiguous terms placed in the contract for its benefit. *Peerless Ins. Co. v. Wells*, 154 Vt. 491, 494, 580 A.2d 485, 487 (1990).

¶ 10. The questions in this appeal are complicated and interrelated. Logically, there are nine starting questions — that is, for each of the three carriers, does the policy extend coverage to each of the three defendants in the underlying litigation?[4] For each of the carriers and de-

---

[4] There are actually additional questions because a carrier could have coverage responsibility for a defendant in the underlying litigation with respect to a plaintiff in that litigation but not with respect to another plaintiff. In effect, this occurred because the Clodgos sued P&C and Heath, but not AMI. This additional complexity does not, however, affect our analysis.

fendants, for which the answer to the coverage question is positive, we must then determine the priority of coverage — that is, is it primary, secondary or tertiary with respect to another carrier's coverage? At some point in this litigation, virtually every possible question and answer was advanced by one or more of the carriers.

¶ 11. The decision in the trial court and the framing of the appeal issues has narrowed the number of questions we must answer. Most importantly, the trial court found, or in some instances assumed, that the answers to the nine opening questions were all affirmative, and that each of the three carriers had, through the applicable policy, extended coverage to all of the three defendants in the underlying litigation. For Fireman's, the trial court apparently based its conclusion upon the deposition testimony of its employee who was empowered to state its position and admitted that its policy covered the liability of P&C and Heath, as well as AMI. Fireman's has not contested this conclusion on appeal, and, as a result, we do not consider its validity.

¶ 12. CNA did not contest the trial court's conclusion that CNA's policy covered P&C and Heath. CNA did, however, contest coverage of AMI in the trial court, and we must answer this appeal question. The situation with respect to Sumitomo is essentially the same because its coverage is derivative of CNA's.

¶ 13. The trial court also found that each carrier's coverage position — primary, secondary or tertiary — was the same with respect to all defendants in the underlying litigation. This conclusion is not logically required. For example, it is entirely possible that a carrier could have primary coverage responsibility for one defendant in the underlying litigation, and only secondary or tertiary excess coverage for the liability of another defendant. While some of these possibilities were raised below, they are not part of the carriers' positions on appeal. Thus, while each of the remaining carrier parties in this appeal — Fireman's and CNA — vigorously argues that its coverage is in some way excess with respect to that of the other, neither argues that its position as either primary or excess varies among defendants.

¶ 14. Thus, we are left with three main questions in this appeal: (1) which of the Fireman's and CNA policies extends primary coverage for the liability of defendants and which, if any, extends excess coverage; (2) what is the coverage position of Sumitomo; and (3) do the policies of CNA and Sumitomo extend liability coverage to AMI.

Fireman's appeal raises the first two of these issues. CNA's cross-appeal raises the third.

¶ 15. The superior court resolved the first question by concluding that both policies extended primary coverage so that each carrier was obligated to pay a pro rata share of any judgment up to the applicable policy maximum. CNA agrees with and defends that position here. Fireman's agrees that CNA's coverage responsibility is primary, but argues that its obligation is for excess coverage that comes into play only when the CNA policy amounts are exhausted. The resolution of this question requires us to look first and foremost at the language of the policies.

¶ 16. CNA contends that Fireman's shares primary coverage responsibility because AMI's trailer is a covered auto under the Fireman's policy and the policy states:

> We will pay all sums an insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.

CNA's policy contains similar general coverage language. If these were the only relevant provisions, CNA's position, and the trial court decision, would clearly be correct without additional analysis. However, each of the policies also contains an "other insurance" clause that pertains directly to this action. The application of these clauses is determinative of this case.

¶ 17. "Other insurance" clauses are used by insurers to "limit an insurer's liability where other insurance may cover the same loss." 15 L. Russ & T. Segalla, Couch on Insurance 3d § 219:1 (1999). Whether an insurer's "other insurance" clause will operate in a given situation depends largely on the specific language of the relevant policies. *Id.* Thus, determining the effect of these two carriers' "other insurance" clauses requires us to scrutinize the language of the policies and any endorsements thereto.

¶ 18. Fireman's policy, a commercial business auto coverage policy, contains the following "other insurance clause" in Section IV, subsection B:

> 5. Other Insurance
> a. For any covered auto you own, this Coverage Form provides primary insurance. For any covered auto you don't own, the insurance provided by this coverage form is ex-

cess over any other collectible insurance. However, while a covered auto which is a trailer is connected to another vehicle, the Liability Coverage this Coverage form provides for the trailer is:

(1) Excess while it is connected to a motor vehicle you do not own.

(2) Primary while it is connected to a covered auto you own.

Fireman's policy also has a fleetcover endorsement. "An endorsement is a writing added or attached to a policy which either expands or restricts the insurance in the policy. It becomes a part of the contract when it is issued . . . ." 13A J. Appleman & J. Appleman, Insurance Law and Practice § 7537, at 37 (Cum. Supp. 2002). This fleetcover endorsement also has an endorsement that makes several amendments to the commercial auto policy, including the "other insurance" clause. The amendment to the "other insurance" clause reads:

3. Other Insurance — Your Policy Will be Amended as Follows:

A. Under Section IV— Business Auto Conditions:

Condition 5: Other Insurance of B. General Conditions is Amended by Changing the Entire Condition as Follows:

5. Other Insurance

If other valid and collectible insurance is available to any insured for a loss we cover under Section II — Liability Coverage and Section III Physical Damage, our obligations are limited as follows:

This insurance is excess over any other liability insurance available to any insured.

As this insurance is excess, we will have no duty under Section II liability to defend any claim or suit that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the other insured's rights against all other insurers.

Because this insurance is excess over other insurance, we will pay only our share of the amount of loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductibles and self-insured amounts under all that other insurance.

Section II Liability Coverage and Section III Physical Damage coverage are not excess to any excess insurance any insured bought specifically to apply in excess of the limits of insurance shown in the declarations of this coverage part.

¶ 19. Fireman's urges us to read these provisions — the clause in Section IV, subsection B of the main policy, the first three paragraphs of the endorsement, and the fourth paragraph of the endorsement — as three independent "other insurance" clauses. CNA in turn argues that the "other insurance" clause set forth in the endorsement is inapplicable because it is an amendment to the fleetcover endorsement and not to the main body of the policy. In CNA's view, the purpose of the fleetcover endorsement is to expand coverage to subsidiaries so that fleetcover provisions apply only if a subsidiary's liability is at issue. Since AMI is the insured, and not the subsidiary of the insured, CNA argues that it is inapplicable here.

¶ 20. We decline to adopt either party's argument. Insurance policies and their endorsements must be read together as one document and "the words of the policy remain in full force and effect except as altered by the words of the endorsement." *Hamilton v. Khalife*, 735 N.Y.S.2d 564, 566 (App. Div. 2001) (internal quotations omitted); see *Waters v. Concord Group Ins. Cos.*, 169 Vt. at 536, 725 A.2d at 927; see also *Preferred Nat'l Ins. Co. v. Docusearch, Inc.*, 829 A.2d 1068, 1074-75 (N.H. 2003) ("[A]n endorsement attached to a policy must be read together with the entire policy."). In this case, the fleetcover endorsement expands the scope of coverage and is incorporated into the main policy. Contrary to CNA's argument, the plain language of the endorsement replaces the "other insurance" clause in the main body of the commercial auto policy with that of the endorsement. The amendment explicitly refers to the policy provision being replaced and provides the new language that now governs. It does not state that the replacement is operative only with respect to expanded coverage.

Accordingly, we conclude that the "other insurance" clause in the endorsement is operative here, in its entirety.

¶ 21. CNA's policy also contains an "other insurance" clause. CNA's clause states:

5. Other Insurance — Primary and Excess Insurance Provisions

a. This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a "trucker" and pursuant to operating rights granted to you by a public authority. This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered "auto" while hired or borrowed from you by another "trucker". However, while a covered "auto" which is a "trailer" is connected to a power unit, this Coverage Form's Liability Coverage is:

1. On the same basis, primary or excess, as for the power unit if the power unit is a covered "auto".

2. Excess if the power unit is not a covered auto.

b. Any trailer Interchange Coverage provided by this Coverage Form is primary for any covered "auto."

c. Except as provided in paragraphs a. and b. above, this Coverage Form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.

d. For Hired Auto Physical Damage coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered auto.

e. Regardless of the provisions of paragraphs a., b., and c. above, this Coverage Form's Liability Coverage is primary for any liability assumed under an "insured contract."

f. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of insurance of our Coverage Form bears to the

total of the limits of all the Coverage Forms and policies covering on the same basis.

The effect of these competing clauses must be determined, first if possible, according to their terms. See *State Farm Mut. Auto Ins. Co. v. Powers*, 169 Vt. 230, 237, 732 A.2d 730, 735 (1999).

¶ 22. The trial court found that CNA's and Fireman's "other insurance" clauses were mutually repugnant and therefore each was responsible for primary coverage. We agree that if the clauses are mutually repugnant, the result is that neither is effective and each insurer shares primary coverage. *Champlain Cas. Co. v. Agency Rent-a-Car, Inc.*, 168 Vt. 91, 97-98, 716 A.2d 810, 814 (1998). In *Powers*, 169 Vt. at 237, 732 A.2d at 735, we explained that in cases involving "multiple insurers all claiming to provide either excess or primary coverage" the insurers would share the coverage responsibility on a pro rata basis. We disagree, however, that the clauses are mutually repugnant in this case.

¶ 23. As courts have worked to reconcile policies with competing "other insurance" clauses certain rules of construction have emerged. See generally D. Richmond, *Issues and Problems in "Other Insurance," Multiple Insurance, and Self-Insurance*, 22 Pepp. L. Rev. 1373 (1995). If policies have dissimilar "other insurance" clauses most courts "attempt to reconcile the clauses in a manner that will give effect to the intent of the parties." *Id.* at 1392. We adopted this general approach in *Powers*, for cases in which our reconciliation does not violate public policy or compromise coverage for the insured. 169 Vt. at 235, 732 A.2d at 734 (citing *Aetna Cas. & Sur. Co. v. CNA Ins. Co.*, 606 A.2d 990, 992-93 (Conn. 1992)).

¶ 24. Contrary to CNA's argument, we do not construe an "other insurance" clause against the insurer. To the extent we have adopted this rule of construction, it is to aid the insured, see *Cooperative Fire Ins. Ass'n v. Bizon*, 166 Vt. 326, 333, 693 A.2d 722, 727 (1997) (interpreting policy exclusion broadly in favor of insured), not another insurance company in litigation with the insurer over the allocation of coverage responsibility. See *United States Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 574 (2d Cir. 1991); *Ellis v. Royal Ins. Cos.*, 530 A.2d 303, 309 (N.H. 1987).

¶ 25. Application of these principles here leads us to the conclusion that the other insurance provisions can be reconciled. Fireman's "other insurance" clause unambiguously states that it is "excess over

*any* other liability insurance available to *any* insured." (Emphasis added.) CNA's policy contains no such excess statement. Rather, CNA's "other insurance" provision first states that it is "primary for any covered 'auto' while hired or borrowed by you and used exclusively in your business as a 'trucker'" and that it is "excess over any other collectible insurance for any covered 'auto' while hired or borrowed from you by another trucker." The P&C trailer truck was a covered automobile and was being used at the time of the accident by P&C in its business as a trucker. The superior court found, and Fireman's has not contested, that the "pup" trailer was a covered auto. Since the power unit for the trailer is a covered auto, coverage for the trailer is on the same basis as the power unit under the specific language covering trailers, as set forth above. Under the unambiguous language of the CNA "other insurance" clause, CNA's coverage obligation is primary, not excess. On their face, the two policies do not have conflicting "other insurance" clauses in the circumstances of this case.

¶ 26. CNA argues that despite the policies' language, Fireman's is primary because: (1) the "Endorsement for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980," commonly known as the MCS-90 endorsement, provides primary coverage, irrespective of the "other insurance" clause; and (2) Fireman's breached its duty to defend its insureds.

¶ 27. CNA contends that the MCS-90 endorsement included in Fireman's policy provides P&C and Heath with primary coverage, regardless of the "other insurance" clause. Congress enacted the Motor Carrier Act of 1980 (MCA),[5] in part, to "address abuses that had arisen in the interstate trucking industry which threatened public

---

[5] The Motor Carrier Act of 1980 (MCA) was preceded by the Interstate Commerce Commission Act of 1935 (ICCA). Prior to 1982, the ICC required form BMC-90 be included in policies. Harold A. Weston, Annotation, *Effect of Motor Carrier Act Provisions on Insurance and Indemnity Agreements (49 U.S.C.A. §§ 13906, 14102) in Allocating Losses Involving Interstate Motor Carriers*, 157 A.L.R. Fed. 549, 561 n.2, § 2[a] (1999). The MCS-90 endorsement is almost identical to the BMC-90 form; therefore we consider those cases that consider the BMC-90 form relevant to this appeal even if they predate the MCA. *Id.*

The MCA incorporated the ICCA, but left jurisdiction with the Interstate Commerce Commission (ICC). The ICC was disbanded in 1996 by the ICC Termination Act of 1995, and its responsibilities were undertaken by the Surface Transportation Board of the Department of Transportation. See *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 699 A.2d 482, 491 (Md. Ct. Spec. App. 1997); *Lynch v. Yob*, 768 N.E.2d 1158, 1161 n.2 (Ohio 2002).

safety, including use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred" while carriers were transporting goods in interstate commerce. *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 489 (4th Cir. 2003); see Motor Carrier Act of 1980, Pub. L. No. 96-296 § 3, 94 Stat. 793. As a result of the MCA, motor carriers who transport goods in interstate commerce "must register with the federal government and demonstrate that they have secured adequate financial resources to pay judgments arising from accidents occurring in the course of their transport business." *Pierre v. Providence Wash. Ins. Co.*, 784 N.E.2d 52, 53 (N.Y. 2002); see 49 U.S.C. § 13906(a)(1). Most carriers show they can meet the minimum financial responsibility requirements, set forth by the United States Secretary of Transportation pursuant to 49 U.S.C. §§ 13902(a)(1)(C), 31139, by purchasing liability insurance with an MCS-90 endorsement. The MCS-90 endorsement, which is set out in 49 C.F.R. § 387.15 illustration 1, provides in relevant part:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. . . . [N]o condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to

make under the provisions of the policy except for the agreement contained in this endorsement.

¶ 28. As the New York Court of Appeals observed, "the endorsement shifts the risk of loss for accidents occurring in the course of interstate commerce away from the public by guaranteeing that an injured party will be compensated even if the insurance carrier has a valid defense based on a condition in the policy." *Pierre*, 784 N.E.2d at 53-54; see S. Collier, *Tenth Circuit Survey: Insurance Law*, 75 Den. U. L. Rev. 1003, 1009 (1998) (stating that the public policy rationale behind MCS-90 endorsement is to protect the public from carriers who do not carry required insurance on their vehicles). The MCS-90 policy, however, does not create coverage where there is none, and accordingly, the endorsement provides that an insurer may seek indemnification if it is eventually determined that the insured is not entitled to payment of claims against it under the policy terms. 49 C.F.R. § 387.15; see *Progressive Cas. Ins. Co. v. Hoover*, 809 A.2d 353, 360 n.11 (Pa. 2002) (explaining that MCS-90 endorsement does not create coverage per se).

¶ 29. To give effect to the federal financial responsibility requirements, the MCS-90 endorsement in Fireman's policy further states:

> The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

> The policy to which this endorsement is attached provides primary or excess insurance, as indicated by X for the limits shown:

> X This insurance is primary and the company shall not be liable for amounts in excess of $1,000,000 for each accident.

> This insurance is excess and the company shall not be liable for amounts in excess of $ _____ for each accident in excess of the underlying limit of $ _____ for each accident.

¶ 30. Under regulations set forth by the Secretary of Transportation, carriers must have at least $750,000 available in coverage and must include the above language in the endorsement. 49 C.F.R.

§§ 387.7(a), 387.9. CNA argues that this endorsement renders Fireman's coverage primary despite the "other insurance" clause. In response, Fireman's contends the MCS-90 endorsement is inapplicable to this case because: (1) the endorsement is intended to apply only to claims by members of the public against shippers; (2) the MCS-90 coverage endorsement operates only if the carrier is hauling a nonexempt commodity, and here milk is an exempt commodity; and (3) at the time of the accident AMI was engaged in intrastate, not interstate, commerce. Because the MSC-90 endorsement is a federally mandated inclusion in the policy, we construe its effect in this case according to federal law. *Lynch v. Yob*, 768 N.E.2d at 1162.

¶ 31. Although federal courts considering this issue are split, the majority of circuits have held that the MCS-90 endorsement has no application to disputes between insurers because the purpose of the endorsement is solely to protect injured members of the public. *Canal Ins. Co.*, 320 F.3d at 493; *Empire Fire & Marine Ins. Co. v. J. Transp., Inc.*, 880 F.2d 1291, 1298-99 (11th Cir. 1989); *Travelers Ins. Co. v. Transp. Ins. Co.*, 787 F.2d 1133, 1140 (7th Cir. 1986); *Carter v. Vangilder*, 803 F.2d 189, 192 (5th Cir. 1986); *Grinnell Mut. Reinsur. Co. v. Empire Fire & Marine Ins. Co.*, 722 F.2d 1400, 1404-05 (8th Cir. 1983); *Carolina Cas. Ins. Co. v. Ins. Co. of N. America*, 595 F.2d 128, 140-41 (3d Cir. 1979); see also *John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 857 (9th Cir. 2000) (MCS-90 endorsement does not govern dispute between insurer and insured because purpose is to protect injured member of the public). Those courts not joining the majority have reasoned that despite the public policy rationale of the MCS-90 endorsement, the endorsement may be applicable to allocation arguments between insurers. *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1348-49 (6th Cir. 1996); *Empire Fire & Marine Ins. Co. v. Guar. Nat. Ins. Co.*, 868 F.2d 357, 361-64 (10th Cir. 1989).[6] We are in accord with the majority view and find the reasoning of the Fourth Circuit's opinion in *Canal Insurance Co.* particularly helpful.

---

[6] As *Prestige* and *Empire Fire* hold, there are actually two alternative rules that can give some effect to MCS-90 endorsements in disputes between insurers. See *Prestige Cas. Co.*, 99 F.3d at 1348; *Empire Fire & Marine Ins. Co.*, 868 F.2d at 361. *Prestige* and *Empire Fire* adopt an intermediate position holding that the endorsement negates limiting provisions, such as an "excess coverage" clause, "but does not establish primary liability over other policies that are also primary by their own terms." *Prestige*, 99 F.3d at 1348. In view of our holding, we do not have to decide the result in this case under the intermediate position.

¶ 32. In *Canal Insurance Co.*, the court considered whether the MCS-90 endorsement operated only "when necessary to protect injured members of the public." 320 F.3d at 492. In deciding to join the majority of its sister circuits, the court reasoned that the MCS-90 endorsement should be inapplicable to coverage disputes between insurers because this conclusion adheres more faithfully to the endorsement's literal language. *Id.* at 493. The court explained that the MCS-90 endorsement specifically states that all policy limitations shall remain in full effect, and that "[t]his language makes clear that the MCS-90 endorsement ... does not alter the relationship between the insured and the insurer as otherwise provided in the policy." *Id.* Because the insurer/insured relationship is not altered, the court reasoned that the endorsement cannot affect coverage allocation between insurers. We agree with this analysis and conclude that because the MCS-90 endorsement is included in the policy by federal mandate to protect injured members of the public from carriers with inadequate insurance coverage, it is not implicated when resolving disputes like this one between insurers.[7] See *T.H.E. Ins. Co. v. Larsen Intermodal Servs., Inc.*, 242 F.3d 667, 673 (5th Cir. 2001).

¶ 33. Nevertheless, CNA contends that injured members of the public are involved in this question because of its agreement in settlement of the Clodgo suit. That settlement agreement specifies

---

[7] We recognize that this position is undermined by Fireman's decision to check the box stating that the policy "to which this endorsement is attached provides primary ... insurance." The first impression of this action is that it is inconsistent with our construction of the policy, as set out above in the body of the opinion. We think, however, the inconsistency is more superficial than real. The alternative box on the federally mandated form requires the insurer to specify the "underlying limit" for each accident over which the policy is excess. Thus, it refers to true excess policies "written under circumstances where rates were ascertained after giving due consideration to known existing and underlying basic or primary policies." *Loy v. Bunderson*, 320 N.W.2d 175, 179 (Wis. 1982); see *infra* ¶¶ 39-40. Fireman's could not have completed this alternative part of the form. Thus, we are not surprised at the observation of the Fireman's witness in *United States Fire Insurance Co. v. Fireman's Fund Insurance Co.*, 461 N.W.2d 230, 233 n.2 (Minn. Ct. App. 1990), that in twenty-five years of underwriting experience "he could not recall an instance where a motor carrier's endorsement had designated excess coverage." We decide that the checking of the box for primary insurance does not change our conclusion that the MCS-90 endorsement does not affect the allocation of coverage responsibility among carriers. This is essentially the holding of *Griffin v. Public Service Mutual Insurance Co.*, 744 A.2d 204, 207-08 (N.J. Super. Ct. App. Div. 2000), where the carrier failed to fill out the form, but the court held that the form would have been irrelevant to the coverage allocation dispute.

that CNA will pay the Clodgos up to $25,000 if CNA is able to recover funds from Fireman's. Since the Clodgos are injured members of the public, and they stand to gain from a determination that Fireman's bears primary coverage responsibility under the MCS-90 endorsement, CNA argues that the MCS-90 endorsement must govern in this case. We find no merit to this argument. CNA independently entered into this settlement agreement with the Clodgos. As Fireman's points out, the additional $25,000 will effectively be paid with Fireman's money as part of the $75,000 CNA will gain from a decision in its favor. This contingent fee is not the public protection intended by MCS-90 endorsements.

¶ 34. Because we conclude that the MCS-90 endorsement is applicable only where protection of a member of the public is implicated, and we find no such protection interest here, we do not consider Fireman's two additional arguments: milk is an exempt commodity and the carrier was engaged in intrastate, rather than interstate, commerce.

■ ¶ 35. We are left with one additional CNA argument as to why Fireman's coverage responsibility should be viewed as primary. CNA contends that Fireman's has breached its duty to defend and settle because it has not participated in, or contributed to, P&C's and Heath's defense in the underlying actions. Fireman's "other insurance" clause, however, explicitly states that since the coverage is excess it has "no duty to defend … any claim or suit that any other insurer has a duty to defend." Where the policy specifically states that there is no duty to defend when the policy provides excess coverage, we will honor this language provided that an insured's overall coverage is not compromised. See *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 834 (Colo. 2004); *Jessop v. City of Alexandria*, 871 So. 2d 1140, 1147 (La. Ct. App. 2004). This is not a case where both insurers denied that they had primary coverage responsibility. See, e.g., *Utica Mut. Ins. Co. v. Miller*, 746 A.2d 935, 947 (Md. Ct. Spec. App. 2000) (concluding that insurer had duty to defend where primary insurer had not been identified). Here, CNA never disputed its status as a primary insurer and pursuant to that status has properly undertaken P&C's and Heath's defenses. Therefore, because it is an excess insurer and CNA has always been identified as the primary insurer, we hold that Fireman's has not breached a duty to defend P&C or Heath.

¶ 36. Having determined that CNA's coverage is primary, and Fireman's is excess, we must determine the coverage allocation position for Sumitomo. Sumitomo argues that as a "true" excess

provider its coverage is not triggered until both CNA's and Fireman's policies are exhausted. CNA also endorses this position. Fireman's, however, contends that its policy is not accessed until both the CNA and Sumitomo policies are depleted or, at a minimum that it is a co-excess insurer with Sumitomo. For the reasons set forth below, we conclude that Fireman's is a secondary policy and Sumitomo is a tertiary policy available only after the other two policies are exhausted.

¶ 37. Sumitomo's policy was purchased by P&C and specifically lists CNA as the underlying primary insurer. The policy, which is titled "Commercial Excess Umbrella Policy," provides coverage in two instances: (1) Coverage A applies where the loss is covered initially by the underlying policy, but the loss is in excess of the underlying policy's limits; and (2) Coverage B applies where the loss is not covered by the underlying policy in the first instance. Coverage A is applicable to this action because it is undisputed that CNA, the underlying insurer, covers the loss. Coverage A provides in relevant part:

> Coverage A- Excess Follow Form Liability Claims Made or Occurrence Coverage
>
> We will pay, on behalf of an insured, damages in excess of the total Limits of Liability of Underlying Insurance as stated in the Schedule of Underlying Insurance. The terms and conditions of the Scheduled Underlying Insurance are with respect to Coverage A made a part of this policy, except for:
>
> > a. any definition, term or condition therein relating to: any duty to investigate and defend, the Limits of Liability, premium, cancellation, other insurance, our right to recover payment, Extended Reporting Periods, or
> >
> > b. any renewal agreement, and any exclusion or limitation attached to this policy by endorsement or included in the Exclusions applicable under coverage A and B of this policy.
>
> With respect to a. and b. above, the provisions of this policy will apply.

Like the other policies in this case, the Sumitomo policy also contains an "other insurance" clause which states:

> If other insurance applies to claims covered by this policy, the insurance under this policy is excess and we will NOT make any payments until the other insurance has been used up. This will NOT be true, however, if the other insurance is specifically written to be excess over this policy.

The policy defines "other insurance" as "[i]nsurance other than Scheduled Underlying Insurance or insurance specifically purchased to be excess of this policy affording coverage that this policy also affords."

¶ 38. We agree that Sumitomo's priority position depends on the nature of its policy's coverage. Sumitomo argues that its policy is a "true excess" policy, while Fireman's is merely a "coincidental" excess policy. Although these two types of policies are similar in some respects, there is a fundamental difference in the nature of the risk assumed by each.

¶ 39. As the Michigan Supreme Court in *Frankenmuth Mutual Insurance Co. v. Continental Insurance Co.* explained: "True excess coverage occurs where a single insured has two policies covering the same loss, but one policy is written with the expectation that the primary will conduct all of the investigation, negotiation and defense of claims until its limits are exhausted." 537 N.W.2d 879, 881 n.4 (Mich. 1995) (internal quotation marks omitted). "True" excess policies are generally purchased to provide the insured protection in the event of a catastrophic loss that exceeds the limits of the insured's primary policy. See *Liberty Mut. Ins. Co. v. Harbor Ins. Co.*, 603 A.2d 300, 302 (R.I. 1992) (quoting 8A J. Appleman, Insurance Law and Practice § 4909.85, at 452, 453-54 (1981)). Because "true" excess policies are designed to supplement, not replace, primary coverage, they generally require underlying primary insurance in a specific sum and list the primary insurance company in the body of the policy. See *Penton v. Hotho*, 601 So. 2d 762, 764 n.3 (La. Ct. App. 1992). "True" excess insurers also require that the named insured purchase primary insurance for the same risks. Richmond, *supra*, at 1399. These requirements allow the "true" excess insurer to accurately assess the risk it is undertaking. Moreover, because the "true" excess policy takes effect only after the primary policy is exhausted, liability for the covered claims does not attach when the loss occurs. *Id.* Rather, liability attaches when the underlying insurance is exhausted. In contrast, "coincidental" excess insurance is primary insurance that is rendered excess by operation of a policy provision, like an "other

insurance" clause, in a specific set of circumstances. *Bosco v. Bauermeister*, 571 N.W.2d 509, 516 (Mich. 1997). A primary policy with an "other insurance" clause is a device used by the insurer to limit liability where other primary insurance exists. *Penton*, 601 So. 2d at 764 n.3. If an "other insurance" clause operates, as it does here, the policy with the controlling "other insurance" clause becomes secondarily liable. See *CNA Ins. Co. v. Selective Ins. Co.*, 807 A.2d 247, 254 (N.J. Super. 2002). This does not mean, however, that like the "true" excess policy, liability attaches only if the primary policy is exhausted. Rather, where a primary policy is secondarily liable because of an "other insurance" clause, liability attaches at the moment of the loss.

¶ 40. Although Fireman's has disputed this characterization, we conclude that Sumitomo's policy is a "true" excess policy and CNA's is a "coincidental" policy.[8] Sumitomo's policy specifically states that it *is* excess to the underlying scheduled policy. Unlike Fireman's policy, the language in the body of the policy does not state that it is excess *if* other insurance exists; rather, Sumitomo's policy requires the existence of other insurance and under no set of facts could it be a primary policy. In contrast, if CNA's insurance had not been available or identifiable, Fireman's policy would have been primary in this litigation. The fact that Fireman's policy is excess under a certain set of circumstances does not transform it from a primary policy with an "other insurance" clause into a "true" excess policy. *Bosco*, 571 N.W.2d at 516. Operation of the "other insurance" clause does not obviate the fact that Fireman's became liable in the underlying lawsuits at the moment of the loss.

¶ 41. Having determined the nature of the policies, we join the majority of courts that have considered a conflict between a "true" and "coincidental" excess provider and hold that the true excess policy need not contribute until after the "coincidental" insurer's limits are exhausted. See, e.g., *Allstate Ins. Co. v. Am. Hardware Mut. Ins. Co.*, 865 F.2d 592, 595 (4th Cir. 1989); *Occidental Fire & Casualty Co. v. Brocious*, 772 F.2d 47, 54 (3d Cir. 1985); *Allstate Ins. Co. v. Employers*

---

[8] Fireman's disputes this characterization because the Sumitomo policy contains a "drop down" provision and, according to Fireman's interpretation of the policy, its "other insurance" provision does not apply to the coverage involved in this case. We agree with Sumitomo's argument that the "other insurance" provision is applicable. We do not find the "drop down" provision — which applies when the underlying coverage is wholly or partially exhausted — inconsistent with the true excess nature of the coverage.

*Liab. Assurance Corp.*, 445 F.2d 1278, 1284 (5th Cir. 1971); *Ins. Co. of N. Am. v. Am. Econ. Ins. Co.*, 746 F. Supp. 59, 64 (W.D. Okla. 1990); *Aetna Ins. Co. v. State Auto. Mut. Ins. Co.*, 368 F. Supp. 1278, 1282 (W.D. Ky. 1973); *Bosco*, 571 N.W.2d at 518; *Liberty Mut. Ins. Co.*, 603 A.2d at 302-03; *State Farm Fire & Cas. Co. v. LiMauro*, 482 N.E.2d 13, 18 (N.Y. 1985); see also Richmond, *supra*, at 1400 (explaining that primary policies rendered excess by operation of "other insurance" provisions are not transformed into "true" excess policies). We conclude that this rule best allocates the coverage in relation to the risk assumed by the carriers.

¶ 42. Based on the allocation rule we have adopted, we hold that Fireman's coverage is secondary and must be exhausted before Sumitomo's coverage under its true excess policy is applicable.

¶ 43. We now turn to the third, cross-appeal issue — whether CNA's policy extends liability coverage to AMI. Sumitomo originally joined CNA's position that it did not extend such coverage, but our holding that Sumitomo's coverage commences only after that of Fireman's makes Sumitomo's involvement superfluous.[9]

¶ 44. CNA argues that its policy does not cover the AMI "pup" trailer or, if it does, the coverage is more limited than that for P&C and Heath and is excess. The applicable endorsement in the CNA policy lists, as an additional insured, "all trailers owned by Agrimark and leased to Pouliot & Corriveu" under a section titled "Designation or Description of Leased 'Autos.'" The policy's definition of "auto" includes a trailer such as the one involved in this accident. The policy defines "leased auto" as: "an 'auto' leased or rented to [the insured] . . . under a leasing or rental agreement that requires [the insured] to provide direct primary insurance to the lessor."

¶ 45. The dispute over CNA's coverage of the trailer relates to this definition of a leased auto. CNA contends that the definition of "leased 'auto'" excludes coverage for the trailer involved in the accident because it was not leased pursuant to a leasing or rental agreement that required P&C to provide direct primary insurance to AMI. In opposition, Fireman's argues that the definition of "leased auto" should not be relied upon because it is a mere technicality and in the alternative, if we decide the definition does apply, the fact that there is no written agreement showing that P&C agreed to provide AMI with direct primary insurance should not be dispositive because other

---

[9] For this reason, we do not address Fireman's argument that Sumitomo failed to argue below that its policy did not cover AMI and its further argument that it had to file a cross-appeal to raise the argument here.

extrinsic evidence demonstrates that P&C intended to provide direct primary insurance for AMI.

¶ 46. The summary judgment record has developed the underlying facts only to a limited extent. The parties entered into a written lease agreement in 1984 whereby AMI leased equipment to P&C. In this lease, AMI agreed to provide insurance on all the equipment listed in an attached schedule. The lease further provided that P&C and AMI would annually review their insurance obligations to determine which party could most economically secure insurance in the coming year. If, pursuant to these discussions, P&C became responsible for providing the insurance, the lease specified that P&C would then be required to name AMI as an insured party. The record does not tell us whether the parties engaged in this annual negotiation. The trailer involved in this accident was not listed on the schedule attached to the 1984 lease and was, instead, the subject of an oral lease agreement. Following the accident, the parties signed a written lease that included the trailer, but this lease is silent on insurance.

¶ 47. As explained above, our task in resolving this dispute is to ascertain the parties' intent by first giving effect to the policies' language. *City of Burlington*, 163 Vt. at 127, 655 A.2d at 721. Although we construe ambiguous terms in favor of the insured and to favor complete coverage, we must give effect to the clear terms of the insurance contract. See *Bizon*, 166 Vt. at 333, 693 A.2d at 727. In this case, the definition of "leased auto" in CNA's endorsement is clear, and it limits the general statement of the equipment covered by the endorsement. The definition may be technical, as Fireman's asserts, but it is applicable to this dispute. Thus, our question becomes whether the lease arrangement between P&C and AMI required P&C to provide direct primary insurance for AMI.

¶ 48. Fireman's argues that P&C must have agreed to provide primary insurance for AMI because: (1) it listed AMI as an additional insured; (2) the trailer involved in the accident was specifically listed in the CNA policy; (3) CNA's agent testified in a deposition that per the arrangement between P&C and AMI certain vehicles "were to be listed on the policy for liability only"; and (4) an AMI employee stated in an affidavit that AMI required lessees to provide insurance and to prove as much by giving AMI a certificate of insurance, which was done in this case. In opposition, CNA claims that: (1) the 1984 lease shows that AMI, not P&C, was required to provide insurance and this reflects the intent of the parties; (2) the listing of AMI as an additional

insured is meaningless because the definition of "leased 'auto'" is controlling; (3) the listing of the "pup" trailer does not show an intent to cover the trailer and, more importantly, the definition of "leased 'auto'" specifies that insurance must be provided for the lessor, not the leased equipment; (4) CNA's agent's testimony "is consistent in that he was given a list of the leased vehicles and told to insure *those vehicles* for liability only"; and (5) the certificate of insurance given to AMI is evidence only of the types of insurance P&C carried. Although the superior court recited much of this conflict, and found that CNA was responsible for coverage of AMI, it did not specify how it resolved the conflict.

¶ 49. Each party in this case has its own version of the oral lease's terms, and each version is supported by viewing certain important facts in a different light. Given the parties' conflicting evidence, the fact that no written record of the oral lease exists, and that resolving the terms of the oral lease is critical to determining whether CNA is responsible for covering the trailer, we conclude that this issue cannot be resolved on summary judgment. There are disputed issues of material fact that prevent summary judgment. See V.R.C.P. 56(c). Therefore, we remand this issue to the trial court.

¶ 50. If on remand the trial court determines that under the endorsement CNA must provide coverage for the trailer, then given the terms of CNA's "other insurance" clause and our holding above, that coverage is primary. If the endorsement does not apply to these circumstances, Fireman's has the sole coverage responsibility for AMI in the litigation in which AMI is named.

*Affirmed in part; reversed and remanded in part for proceedings consistent with this opinion.*