Trinder v. Conn. Attorneys Title Ins. Co., No. 681-9-08 Rdcv (Cohen, J., June 7, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT
## RUTLAND COUNTY

| | | |
|---|---|---|
| | ) | |
| **KENNETH G. TRINDER and** | ) | **Rutland Superior Court** |
| **LARISSA F. TRINDER** | ) | **Docket No. 681-9-08 Rdcv** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CONNECTICUT ATTORNEYS TITLE** | ) | |
| **INSURANCE COMPANY and MOUNT** | ) | |
| **HOLLY COMMUNITY HISTORICAL** | ) | |
| **MUSEUM, INC.,** | ) | |
| | ) | |
| **Defendants** | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

This is a title-insurance-coverage dispute concerning Kenneth and Larissa Trinder's septic tank and leach field. A bench trial was held on December 21, 2009. The Trinders are represented by Stephen S. Ankuda, Esq. Connecticut Attorneys Title Insurance Company is represented by Michael J. Harris, Esq.

## FINDINGS OF FACT

(1)     Kenneth Trinder and Larissa Trinder purchased a parcel of land and a house at  [address redacted]  in Mount Holly, Vermont, on January 3, 2005.

(2)     The Trinders were represented in that transaction by Attorney Susan Meany of Ludlow, Vermont, who also was the title insurance agent for Connecticut Attorneys Title Insurance Company (CATIC).

(3)     CATIC is a title insurance company licensed to do business in the State of Vermont.

(4) Mount Holly Community Historical Museum, Inc. owns the property immediately to the north of the Trinders' property on Maple Hill Road.

(5) The Trinders gave power of attorney to Attorney Susan Meaney to close the transaction on their behalf.

(6) The Trinders purchased title insurance from CATIC and were issued a policy commitment at closing (PC 2000290), signed by Susan Meaney on behalf of CATIC.

(7) The "Expanded Protection Owner Policy" issued by CATIC was dated January 5, 2005.

(8) The policy states: "We will defend your title in any court case as to that part of the case that is based on the Covered Title Risk Insured against by this Policy. We will pay the costs, attorney's fees and expenses we incur in that defense."

(9) Under the policy, the Covered Title Risks includes: "11. Your title is unmarketable, which allows another person to refuse to perform a contract to purchase, to lease, or to make a mortgage loan."

(10) The Covered Title Risks also includes: "12. You are forced to remove your existing structure—other than a boundary wall or fence—because: it extends on to adjoining land or on to any easement."

(11) In the early fall of 2007, Kenneth Trinder received a telephone call from a person at Kelley Real Estate suggesting that the Trinders make a donation to the Mount Holly Historical Museum because the Museum was planning to expand and that this donation could be used to settle any disputes

2

concerning the location of the Trinders' right to maintaining their septic system on the Museum's property.

(12) This was the first notice the Trinders had that their septic system and leach field may be located on the Museum's property.

(13) On October 24, 2007, the Trinders received a letter from the Museum in which the Museum informed them that after speaking with the prior owner of the Museum property (called "The Perkins House"), it was the Museum's understanding that there was a prior verbal agreement in place between the former owners of both properties and that the Trinders' septic system was permissively on the Museum's property and was subject to removal upon request.

(14) The October 24, 2007 letter did not contain a request by the Museum for the Trinders to remove the septic system or a threat to assert a claim to remove the septic system.

(15) After receiving the October 24 letter, the Trinders contacted their attorney, Suzanne Meaney, and she placed CATIC on notice of the Trinders' claim by letter dated January 29, 2008.

(16) Thereafter, the Trinders obtained independent counsel for the purpose of continuing with their title insurance claim.

(17) On May 30, 2008, the Trinders received a letter from CATIC informing them that its findings were not yet complete, but that it "does not appear that title rights are implicated." CATIC further stated that its investigation was expected to be completed by June.

(18) On August 5, 2008, the Trinders were notified, through counsel, by the Museum, through its counsel, that the Museum intended to recommence construction activity on the former Perkins homesite which was adjacent to the Trinder property.

(19) The August 5 letter further states: "Not having had a reply to my letter of May 8. I am uncertain whether your failure to reply suggests an abandonment of any claim on the part of the Trinders to the use of the septic system on the Museum's property. Please understand that activity which will soon commence may well compromise any such use. We remain willing to meet with you to consider any suggestions the Trinders may have to deal with their problem."

(20) The August 5 letter does not contain a request by the Museum for the Trinders to remove the septic system, nor does it contain a threat of claim by the Museum to have the septic system removed.

(21) On August 19, 2008, the Trinders received a letter from CATIC in which CATIC concluded that the Trinders claim was excepted from coverage under Schedule B of the policy, which states "This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of: General Exceptions: B. any facts which an accurate survey or personal inspection of the land would disclose."

(22) The Museum never filed suit against the Trinders.

(23)  On September 5, 2008, the Trinders filed suit, requesting declaratory relief providing for insurance coverage from CATIC, a claim for adverse possession, easement, or license against the Museum, and a claim for contract damages against CATIC.

(24)  The Museum did not file a counterclaim against the Trinders. It requested that the Trinders' claim by dismissed.

(25)  The Museum never filed a pleading asking the Court to require the removal of any portion of the Trinders' septic system.

(26)  The Museum never filed any pleading asking for any injunctive relief relating to the Trinder septic system.

(27)  There has never been any civil lawsuit or complaint or request by the Museum to any town or state office asking for any finding or order to require the Trinders to remove or cease use of any part of their septic system.

(28)  In August 2009, the Trinders and the Museum reached an agreement as to the placement of the septic system.

(29)  The Trinders and the Museum agreed that the Trinders had the right to maintain and replace their existing leach field in the same location where it existed as long as the Trinders replaced their existing 600 gallon septic tank with a 1,500 gallon concrete septic tank with filters.

(30)  The replacement septic tank was placed in the same location as the prior one.

(31)     The Trinders and the Museum also agreed to give the Museum a right to share in the Trinders' drilled well and an easement for the location of the Museum's propane tank.

(32)     The Trinders and the Museum also agreed to a mutual boundary line between the Trinder and Museum property.

## DISCUSSION

The Trinders seeks coverage under the title insurance policy to reimburse them for engineering costs, septic tank replacement costs, and attorney's fees. Specifically, the Trinders seek coverage under the covered title risk in the case that "[y]ou are forced to remove your existing structure—other than a boundary wall or fence—because: it extends on to adjoining land or on to any easement." They argue that they were forced to remove their septic system by the Museum because it extended on to the Museum's adjoining land.

The Trinders also argue that because the Museum asserted that the Trinders had only permissive use of the septic system location, subject to removal upon request, that this formed a cloud on the Trinders' title and made the title unmarketable. Thus, they also seek to invoke the clause of the policy which provides coverage if "[y]our title is unmarketable, which allows another person to refuse to perform a contract to purchase, to lease, or to make a mortgage loan."

In Vermont, construction of the language of an insurance contract is a question of law, not of fact; accordingly a court makes its own inquiry into the legal effect of the contracts' terms and the relationships between them. *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 8, 177 Vt. 215. Insurance contracts are to be interpreted according to

6

their terms and the intent of the parties as expressed by the policies' language. *Fireman's Fund Ins. Co.*, 2004 VT 93, ¶ 9. Insurance contracts must be given a practical, reasonable, and fair interpretation, consonant with the apparent object and intent of the parties, and strained or forced constructions are to be avoided. *McAlister v. Vermont Property and Cas. Ins. Guar. Ass'n*, 2006 VT 85, ¶ 17, 180 Vt. 203.

Any ambiguities in insurance policies are construed in favor of finding coverage. *DeBartolo v. Underwriters at Lloyd's of London*, 2007 VT 31, ¶ 9, 181 Vt. 609. Ambiguity arises where insurance policy language can be reasonably or fairly susceptible of different constructions. *Chamberlain v. Metropolitan Property and Cas. Ins. Co.*, 171 Vt. 513, 515 (2000). If a disputed term is susceptible to two or more reasonable interpretations, the ambiguity must be resolved in favor of the insured. *Serecky v. National Grange Mut. Ins.*, 2004 VT 58, ¶ 17, 177 Vt. 58.

A dispute, however, over the proper interpretation of a contract or insurance policy does not automatically render the language ambiguous. *Towns v. Vermont Mut. Ins. Co.*, 169 Vt. 545, 546 (1999). An insurer will not be deprived of unambiguous terms placed in the contract for its benefit. *Fireman's Fund Ins. Co.*, 2004 VT 93, ¶ 9.

Here, the pertinent policy clause states ""[y]ou are *forced* to remove your existing structure—other than a boundary wall or fence—because: it extends on to adjoining land or on to any easement." (emphasis added). The parties disagree over the meaning of the term *forced* and the Vermont Supreme Court has yet to interpret the meaning of this clause. When a disputed term has not been specifically defined in an insurance policy, it should be defined according to its plain, ordinary and popular meaning. *Fireman's Fund Ins. Co.*, 2004 VT 93, ¶ 8; see also *Northern Sec. Ins. Co. v. Perron*, 172 Vt. 204, 210

(2001) (holding that the word "accident" was not defined in the policy, thus term should be defined according to the usual understanding of the term's significance to the ordinary person); 2 Couch on Ins. § 22:38 (3d ed. 2008) ("Usual and ordinary meaning" has been stated variously to be that meaning which the particular language conveys to the popular mind; to most people; to the average, ordinary, normal, or reasonable man; to persons with usual and ordinary understanding; and to a businessman or a layman, rather than a lawyer or insurance professional).

According to Merriam-Webster's Collegiate Dictionary, the verb *force* means "to compel by physical, moral, or intellectual means." Merriam-Webster's Collegiate Dictionary 489 (2003). Black's Law Dictionary defines *force* to mean "to compel by physical means or by legal requirement." Black's Law Dictionary 673 (8th ed. 2004).

Under the plain meaning of the word, the Court does not find that the Trinders were *forced* to remove their existing septic system. Not only did the Museum never file suit against the Trinders to force the removal of the septic system, the Museum did not even file a counterclaim against the Trinders when they filed suit. Furthermore, the Museum never once requested in any of its letters that the Trinders actually remove the septic system. It merely informed them of its belief that it could request removal at any time. Finally, the Trinders and the Museum entered into an agreement whereby the Trinders were able to place a brand new septic tank in the same location as the prior one. Therefore, to find that the Trinders were forced to remove the septic tank would be "a strained or forced" construction, which is to be avoided. *McAlister*, 2006 VT 85, ¶ 17; see also *Manneck v. Lawyers Title Ins. Corp.*, 28 Cal.Rptr.2d 771 (Cal. Ct. App. 1994) (holding clause in policy pertaining to forced removal only comes into play if in fact

8

there is a forced removal of the insured's structures which encroach on the property of another).

The Trinders also seek to invoke the clause providing coverage in the case that "[y]our title is unmarketable . . ." The Trinders argue that a memorandum filed in the Mount Holly Town Records for the neighboring land made their title unmarketable and CATIC had a duty to defend. The memorandum stated the prior owners' (of the Perkins House) stance that the septic tank was on their property by verbal agreement and could be removed at any time. The Trinders argue this constituted a cloud and encumbrance on their parcel.

However, as stated above, no claim was ever filed by the Museum asserting a right to remove the septic system and the Museum did not even seek to establish this right by counterclaim when the Trinders sued it. Furthermore, the memorandum did not make the Trinders title unmarketable because it only stated that the septic system was subject to removal, not that the Trinders could not keep it there and have access to it. In sum, there was never was any actual challenge to the Trinders' title. The Trinders have not proved that their title was ever unmarketable.

In conclusion, CATIC has no duty to defend or to indemnity the Trinders under the title insurance policy.

### ORDER

The Court finds in favor of the defendant Connecticut Attorneys Title Insurance Company. Judgment will entered in Defendant's favor.

Dated at Rutland, Vermont this _____ day of _____, 2010

_____
Hon. William Cohen
Superior Court Judge

9