2004 VT 124

# Hardwick Recycling & Salvage, Inc. f/k/a Green Mountain Sanitation, Inc., and Richard F. Towns v. Acadia Insurance Company

[869 A.2d 82]

No. 03-317

Present: **Dooley, Johnson, Skoglund and Reiber, JJ., and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed December 17, 2004

*John L. Franco, Jr.*, Burlington, for Plaintiffs-Appellants.

*Thomas M. Higgins* of *Pierson Wadhams Quinn Yates & Coffrin*, Burlington, for Defendant-Appellee.

¶ 1. **Johnson, J.** Plaintiffs sued for coverage under the pollution coverage included in their comprehensive general liability insurance policy issued by defendant Acadia Insurance Company. Plaintiffs appeal from the trial court's order denying their partial summary judgment motion seeking a declaration that Acadia owes them a defense against a pending environmental enforcement action brought by the State in 2000; the court entered judgment for Acadia instead. Plaintiffs contend that the trial court erred in holding that the State's 1995 claims against them for environmental site investigation and remediation planning because of contamination on their property were not claims for "damages" covered by the policy, and thus did not trigger Acadia's duty to defend against the enforcement action. We conclude that the trial court incorrectly interpreted the policy term "damages." Therefore we reverse one ground upon which the trial court based its opinion, and we remand for additional proceedings necessary to resolve outstanding issues in the case.

¶ 2. Plaintiffs Hardwick Recycling & Salvage, Inc. (Hardwick Recycling), Green Mountain Sanitation, Inc. (GMS), and Richard Towns are all named insureds under a liability insurance policy issued by Acadia. The policy coverage commenced in September 1994 and was renewed annually through September 2001, although the parties limited the coverage over time. During the years in question, Richard Towns was the president and principal owner of GMS. Hardwick Recycling is a subsidiary of GMS.

¶ 3. The relevant portions of plaintiffs' policy provide that Acadia "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' included within the 'pollution liability hazard' to which this insurance applies." The definition of "property damage" includes "[p]hysical injury to tangible property, including all resulting loss of use of that property." "[P]ollution liability hazard" is defined as "property damage" resulting from "pollutants" at or from property owned by the insured. "Pollutants" include "any solid, liquid, [or] gaseous ... irritant ... including ... chemicals and *waste. Waste includes materials to be recycled ....*" (Emphasis added.)

¶ 4. The pollution coverage under the policy was provided on a "claims made" basis. Specifically, the policy provides:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
(2) The "bodily injury" or "property damage" occurs during the policy period; and
(3) A claim for damages because of the "bodily injury" or "property damage" *is first made against any insured, in accordance with paragraph c. below, during the policy period.*

. . . .

(c) A claim by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

(1) When notice of such claim is received and recorded by any insured or by us, whichever comes first .... (Emphasis added.)

¶ 5. In 1995, the State, through the Secretary of the Agency of Natural Resources (ANR), initiated a series of enforcement actions in connection with plaintiffs' alleged pollution-related violations of environmental and waste management laws. First, in March 1995, the State filed an "Application for Emergency Order" in the Vermont Environmental Court. Among other things, the application alleged "[o]peration of the [Hardwick Recycling] transfer station is an immediate threat to the health, safety and welfare of the citizens of Vermont as a result of the discharge of solid waste leachate into the floodplain

and waters of the Lamoille River." The Environmental Court denied the State's application without prejudice because it concluded that the application alleged violations of plaintiffs' Act 250 permit, and the court was empowered to enforce only emergency orders involving unpermitted activity.

¶ 6. In May 1995, the State, through an Environmental Enforcement Officer, requested and received an Access Order from the Caledonia District Court. In its application supported by five affidavits attesting to environmental contamination, the State alleged that "reasonable grounds exist to suspect violations of Vermont Environmental Laws, and Vermont Solid Waste Management Regulations." The court granted the State's request, and ordered that plaintiffs provide "full access" to the State for investigation of the alleged pollution on the premises.

¶ 7. As an apparent follow-up to investigations conducted pursuant to the May access order, the State, through the Hazardous Materials Management Division of ANR, issued a "Request for investigative activities at Green Mountain Sanitation, Hardwick (VT DEC Site #95-1792)," to plaintiffs' consultant, which was copied to plaintiffs' counsel and Richard Towns among others. The letter stated that DEC personnel had discovered "(1) ... surficial oil discharge; (2) a leaking drum which contained volatile organic compounds; (3) elevated levels of total petroleum hydrocarbons in the swale which discharges into the Lamoille River and; (4) buried solid waste material throughout the property." The State concluded that additional work was necessary to determine if further "investigation, monitoring and/or remediation" was warranted and thus requested plaintiffs to undertake substantial on-site work. Inexplicably, the State took no further enforcement action until October 2000.

¶ 8. In October 2000, the State, through the Attorney General, initiated a civil suit against plaintiffs in Washington Superior Court. In its complaint, the State alleged that, between 1992 and 1995, plaintiffs illegally buried solid waste on the Hardwick Recycling premises in violation of Vermont Solid Waste Management Rule 6-302(c), 10 V.S.A. § 6605(a), and Act 250. The State thus requested that the court find plaintiffs in violation of these laws, and:

> (4) order the defendants to extract and properly dispose of any wastes illegally stored at or disposed of at the [Hardwick Recycling facility];

(5) order the defendants to remediate the site to mitigate any hazard to human health or the environment; [and]

(6) order the defendants to pay civil penalties, costs, and reimbursement for the costs of enforcement, including legal fees, in accordance with 10 V.S.A. § 8221.

¶ 9. Shortly after the State filed its complaint, plaintiffs notified Acadia of the suit in a letter from plaintiffs' attorney. The letter stated that the allegations in the State's complaint "were first brought to the attention of [plaintiffs] in May of 1995" and that "[f]or reasons unknown to us the State has elected to now prosecute this claim some 5 ½ years later." Plaintiffs did not attach any of the 1995 documents to the claim letter, or otherwise explain the details of the 1995 claims, including the Environmental Court order issued in March 1995.

¶ 10. Even though plaintiffs sought coverage for a defense and, if needed, indemnification for costs associated with the State's 2000 suit, their letter identified policy CPA 001066-10, the policy that was in effect from 1994 to 1995, as the applicable source of coverage. Plaintiffs' pollution liability coverage from Acadia was eliminated in 1997; however, the 1994-1995 policy provides that "[a]ll claims for injury or damage arising out of a discharge, release or escape of pollutants . . . shall be deemed to have been made at the time the first of those claims is made against any insured."

¶ 11. In a reply letter sent by Acadia's Director of P&C Claims, Acadia informed plaintiffs' counsel that there was no coverage for the State's environmental claim because "[a]ll [t]he Acadia policies were written with applicable pollution exclusions" and "[i]n addition, there is no coverage for the allegations of illegal acts." Defendant's reply letter also stated that, because of a "Consent to Rate Application," "[c]overage for pollution was eliminated from the Acadia policies."

¶ 12. In response to Acadia's denial of coverage, plaintiffs sued Acadia in December 2001 seeking a declaratory judgment that it has a duty to defend plaintiffs in the suit brought against them by the State in 2000, and that it owes plaintiffs their incurred defense costs to date. Acadia answered interposing eighteen affirmative defenses. Plaintiffs then moved for partial summary judgment on all but defendant's pollution exclusion defense because the above-quoted denial of coverage letter did not reserve Acadia's right to later deny coverage on other grounds. Judge Teachout granted plaintiffs' motion.

¶ 13. Plaintiffs next moved for partial summary judgment that defendant owed and owes plaintiffs a defense in the underlying lawsuit brought by the State in 2000. Plaintiffs argued that the 1994-1995 policy provided coverage for the 2000 suit because it was based on "claims" that the State first made in 1995, even though their policy in effect in 2000 did not include pollution coverage. The trial court, Judge Katz presiding, agreed with defendant that the claims brought by the State in 1995 did not constitute claims for "damages," and thus did not trigger coverage during that policy term. Though its conclusion on "damages" should have ended the entire case in defendant's favor, the court ruled that additional discovery could take place on defendant's late notice defense because it was a fact question. Plaintiffs argued that the trial court's order on the first partial summary judgment had ruled the defense of late notice out of the case. Judge Katz apparently disagreed, but made only an oblique reference to the court's earlier order. Judge Katz entered final judgment for defendant, and plaintiffs appealed.

¶ 14. When reviewing the trial court's grant of summary judgment, we apply the same standard as the trial court. We will affirm summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999); V.R.C.P. 56(c). We conduct a plenary, nondeferential review of the questions of law raised by the motion.

¶ 15. Plaintiffs appeal the order denying their partial summary judgment motion to the extent that it rejected their argument that Acadia had a duty to defend plaintiffs against the State's environmental enforcement action filed in 2000. An insurer's duty to defend is broader than its duty to indemnify. *City of Burlington v. Nat'l Union Fire Ins. Co.*, 163 Vt. 124, 127, 655 A.2d 719, 721 (1994). A claim against the insured triggers the insurer's duty to defend whenever it appears that the policy might cover that type of claim. *Garneau v. Curtis & Bedell, Inc.*, 158 Vt. 363, 366, 610 A.2d 132, 134 (1992). The duty to defend is not triggered, however, when the circumstances indicate that, as a matter of law, there would be no duty to indemnify. *Id.* We determine whether the insurer has a duty to defend by comparing the allegations in the underlying claim to the policy's coverage terms. *City of Burlington*, 163 Vt. at 127, 655 A.2d at 721.

¶ 16. Our review of the record leads us to conclude that the State's claims against plaintiffs in 1995 were claims for "damages"

because of "property damage" caused by plaintiffs' polluting activities. The State took actions against plaintiffs that could have legally obligated them to pay sums of money to remedy their alleged violations of law, and thus those actions were claims for "damages" for purposes of triggering the insurer's duty to defend. Accordingly, we reverse the trial court's grant of summary judgment for Acadia on the issue of whether the claims made against plaintiffs in 1995 were claims for "damages." Nonetheless, for the reasons we discuss below, we remand the case for additional proceedings.

## I. Waiver of Defenses

¶ 17. As an initial matter, in their brief and at oral argument, plaintiffs argue that by specifically asserting two grounds for denying coverage and failing to reserve the right to later raise additional grounds, Acadia's letter limited it to the grounds for denial contained in the letter. This waiver argument, brought under *Cummings v. Connecticut General Life Insurance Co.*, 102 Vt. 351, 148 A. 484 (1930), and its progeny, persuaded the first superior court judge who presided over this case to grant plaintiffs partial summary judgment excluding all but one of the eighteen "affirmative defenses" Acadia pled in its answer. One of the excluded defenses was that "[p]laintiffs' claims are barred to the extent that they do not involve 'damages,' 'property damage,' 'bodily injury' or 'personal injury' as those terms are used in the Policies." This is, however, the very ground upon which another superior court judge subsequently granted summary judgment for Acadia. Plaintiffs argue, therefore, that the trial court erred not only in its interpretation of the policy term "damages," but also in reaching the previously foreclosed issue at all. While we reverse on the merits of the "damages" argument, we affirm the court's decision to address this and another excluded defense, notwithstanding its earlier order striking these "affirmative defenses."

¶ 18. In their first motion, plaintiffs prevailed by arguing for the application of the *Cummings* rule that when an insurer elects to specify reasons for denying coverage it thereafter waives all other available grounds for denying coverage unless it expressly reserves the right to later raise other grounds. *Id.* at 360, 148 A. at 486. Before this rule can be applied, however, the insured must show that a claim of payment "necessarily preceded the refusal." *Hamlin v. Mut. Life Ins. Co.*, 145 Vt. 264, 269, 487 A.2d 159, 162 (1984). In addition, a

prelitigation denial of coverage is not an effective waiver of defenses to aspects of the claim that were not known to the insurer until after the litigation had commenced. *Segalla v. U.S. Fire Ins. Co.*, 135 Vt. 185, 189-90, 373 A.2d 535, 538 (1977). Because a waiver involves the relinquishment of a known right, an insurer "cannot be held to have waived a defense to a claim of which it was ignorant at the time of sending the [denial] letter." *Id.* at 190, 373 A.2d at 538. On the "damages" defense as well as the late notice defense that the superior court's second ruling leaves partially unresolved, we will not find a waiver based on the denial of coverage letter when it is clear that the manner in which plaintiffs tendered their claim obscured the availability of these and other defenses.

¶ 19. The defenses that Acadia reasserted in opposing plaintiffs' second motion for partial summary judgment all pertained to the 1995 "claims" that plaintiffs argue triggered coverage under the 1994-1995 policy. Because plaintiffs' policy is a "claims-made" policy, under its terms, plaintiffs must first establish that the State made a covered claim against them during the relevant coverage period. Acadia concedes that the coverage period ran from September 1, 1994 to September 1, 1997. Though the 2000 claim was not made within this period, plaintiffs argue that the policy's Pollution Endorsement, A.1.c. — referred to by plaintiffs as the "retroactivity clause" — brings the 2000 claim within the coverage period because of its relation to the claim made in 1995. The retroactivity clause states that:

> All claims for injury or damage arising out of a discharge, release or escape of pollutants, including all injury or damage arising out of all subsequent exposure of persons and property to such pollutants, *shall be deemed to have been made at the time the first of those claims is made against any insured.*

(Emphasis added.) The policy also states that a claim for damages because of property damage is "deemed to have been made at the earlier of the following times: (1) When notice of such claim is received and recorded by any insured or by us, whichever comes first." These clauses require the court to focus its inquiry on the 1995 enforcement actions because plaintiffs claim that both the 2000 suit and the 1995 actions are claims for property damage arising out of the same "discharge, release, or escape of pollutants," and that plaintiffs first received notice of these claims in 1995. Plaintiffs cannot, therefore, take advantage of the relation back accomplished by the "retroactivity

clause" unless plaintiffs can first show that the 1995 actions might possibly fall within the policy's terms of coverage, specifically that any one of the 1995 enforcement actions could be considered a claim for "damages" because of "'property damage' included within the 'pollution liability hazard.'" We accept plaintiffs' interpretation of the retroactivity clause as reasonable for purposes of deciding the ultimate issue of coverage for the 2000 claim. But for purposes of assessing a waiver of defenses, we cannot agree with plaintiffs' contention that their October 20, 2000 notice of claim letter adequately disclosed the extent to which their 2000 claim depended on the 1995 actions.

¶ 20. Plaintiffs' "notice of claim" letter does mention that the allegations in the 2000 complaint against them "were first brought to the attention of [plaintiffs] in May of 1995." The letter, authored by plaintiffs' current counsel, further states that:

> I served as their attorney regarding [the State's claims.] I had argued to the State at that time that the claims were not legally supportable, arguments that had until now dissuaded the State from going forward. For reasons unknown to us the State has elected to now prosecute this claim some 5 ½ years later.

The letter makes no reference to the "retroactivity clause." Moreover, it includes very few specifics on what relief the State sought in 1995 and says nothing about whether the State initiated any formal proceedings, legal or administrative, against plaintiffs in 1995. Plaintiffs did attach a copy of the 2000 complaint, but omitted the 1995 documents even though their theory of coverage for the 2000 claim depended on a determination that the State had made covered claims in 1995. In fact, according to Acadia's surreply to plaintiffs' second motion for partial summary judgment, the first time plaintiffs tendered the 1995 "claims" to Acadia was in connection with plaintiffs' second motion.

¶ 21. Our own review of the trial court file confirms this. Plaintiffs' complaint makes no reference whatsoever to the retroactivity clause and the way in which the 1995 enforcement actions relate to the 2000 claim. In fact, the complaint does not even mention the 1995 enforcement actions. Plaintiffs' first motion for partial summary judgment also fails to reference to the 1995 actions, although plaintiffs did attach a copy of the notice of claim letter as an exhibit to the motion. When Judge Teachout ruled on the first motion for partial summary judg-

ment, neither she nor Acadia was aware of the role that the 1995 actions played in plaintiffs' case. Because the·denial of coverage letter preceded plaintiffs' disclosure of the relevant details of the 1995 enforcement actions and their connection to plaintiffs' claim for coverage in 2000, it cannot waive defenses that Acadia had no way of knowing were necessary and available. *Segalla,* 135 Vt. at 189, 373 A.2d at 538. When viewed in this light, Judge Teachout's ruling cannot be·construed as excluding defenses that Acadia may have against the 1995 claims upon which coverage for the 2000 claim depends. Accordingly,·Judge Katz did not err by subsequently considering the "damages" and late notice defenses as they pertained to the 1995 claims.

## II. Damages

¶ 22. We now decide whether any of the 1995 enforcement actions were claims for "damages" under the policy. The pollution endorsement corresponding to plaintiffs' commercial general liability coverage applies only to "those sums that [plaintiffs] become[] legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" The policy defines the term "property damage," but leaves the term "damages" undefined. The trial court settled on a technical definition of "damages" adopted from cases that categorically excluded government-ordered costs of responding to and remediating pollution, e.g., *City of Edgerton v.·General Casualty Co.,* 517 N.W.2d 463 (Wis. 1994), and *General Casualty Co. of Wisconsin v. Hills,* 561 N.W.2d 718 (Wis. 1997). The trial court, therefore, held that the State's March 1995 enforcement action was not a claim for "damages." A large majority of courts have rejected the rigid interpretation of "damages" upon which the trial court based its conclusion. See *Johnson Controls, Inc. v. Employers Ins. of Wausau,* 2003 WI 108, ¶¶ 4, 100 n.41, 665 N.W.2d 257 (overruling *Edgerton,* and collecting cases that have held contrary to it). We too reject this approach, choosing instead to interpret the term "damages" by considering the reasonable expectations of the insured party under the circumstances. See *id.* ¶ 31 (determining whether the policy term "damages" encompasses response costs incurred as a result of liability under federal environmental law requires court to "comprehend the nature of environmental response costs as understood by a reasonable insured faced with CERCLA liability"). When an insured becomes legally obligated to pay money because the insured has caused an injury to the environment by its wrongful violation of environmental law, the sums the insured must pay as a result are properly classified as damages. After reviewing the

record, we conclude that at least one of the State's 1995 enforcement actions sought to legally obligate plaintiffs to spend money because their activity had allegedly polluted the environment in violation of state environmental law, and, therefore, was a claim for "damages" as that term could reasonably be understood.

A.

¶ 23. In construing an insurance policy, we read disputed terms according to their plain, ordinary, and popular meaning. *State v. CNA Ins. Cos.*, 172 Vt. 318, 324, 779 A.2d 662, 667 (2001). Because a policy is prepared by the insurer with little effective input from the insured, we construe insurance policies in favor of the insured, in accordance with the insured's reasonable expectations for coverage based on the policy language. *Coop. Fire Ins. Ass'n v. White Caps, Inc.*, 166 Vt. 355, 360, 694 A.2d 34, 37 (1997); accord *State Farm Mut. Auto. Ins. Co. v. Roberts*, 166 Vt. 452, 461, 697 A.2d 667, 672 (1997) (recognizing important role played by reasonable expectations of the parties in determining scope of insurance coverage).

¶ 24. On appeal, Acadia has relied heavily on the reasoning first articulated in the now-overruled Wisconsin case of *City of Edgerton v. General Casualty*. *Edgerton* involved a claim by insureds seeking defense costs and indemnification against federal and state enforcement actions requiring the insureds to incur costs to clean up and remediate polluted sites. The Wisconsin Supreme Court held that such enforcement actions, brought under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and related state laws, were not claims for "damages" as that term was used in an insurance policy that is almost identical to the one at issue here. 517 N.W.2d at 477-78. The Wisconsin Supreme Court held that remediation and response costs "are, by definition, considered to be equitable relief and reflect a congressional intent to differentiate between cleanup or response costs ... and damages for injury, destruction, or the loss of natural resources." *Id.* at 478 (citations omitted). In overruling *Edgerton*, the Wisconsin Supreme Court subsequently conceded that it "did not correctly analyze the term 'damages' in the standard CGL policy in relation to environmental cleanup costs." *Johnson Controls*, 2003 WI 108, ¶ 4.

¶ 25. In *Johnson Controls*, the insurers asked the court to reaffirm the notion that cleanup costs were an "equitable" form of relief not covered by the policies, that, in the insurers' view, applied only to

"legal damages." *Id.* ¶ 32. Taking the opposite view, Johnson Controls argued that response costs are "damages" from the perspective of a reasonable insured because "the law imposes costs on the insured to remediate property that the insured previously damaged." *Id.* ¶ 33. The court noted that, in *Edgerton*, it had misapplied some of the authorities it relied on in arriving at its legal/equitable distinction that excluded cleanup costs incurred in response to an injunction. *Id.* ¶¶ 39-44. The court recognized that the purpose of some injunctions is to "provid[e] compensation for past wrongs," which is the same result accomplished by money damages paid directly to an opposing party. *Id.* The court also faulted *Edgerton* for misapprehending the nature of CERCLA cleanup costs. *Id.* ¶¶ 45-46. CERCLA's goal is to promptly restore a contaminated site to its original uncontaminated condition; the costs of the necessary remedial efforts "are expressly expected to be borne by the parties responsible for the polluted condition of the land." *Id.* ¶ 47. The court noted that CERCLA imposed liability on Johnson Controls because the government had administratively established Johnson Controls's "contribution, in some form, to the pollution of the properties." *Id.* The court concluded that environmental response costs ordered under CERCLA were properly classified as "sums that an insured is legally obligated to pay as damages," and therefore must be indemnified by the insurer, unless coverage is otherwise excluded by the policy. *Id.* ¶ 120.

¶ 26. The Federal District Court for the District of Vermont also concluded that cleanup costs ordered under CERCLA are "damages" covered by a CGL policy. *Village of Morrisville Water & Light Dep't v. U.S. Fid. & Guar. Co.*, 775 F. Supp. 718, 725 (D. Vt. 1991) (applying Vermont law to interpret policy language that is identical to the language at issue here). The insured had sought coverage for money it had expended in environmental response costs ordered by the Environmental Protection Agency (EPA) in a Potentially Responsible Party (PRP) letter sent to the insured. Among other reasons, the insurer denied coverage because of its belief that such response costs were not "damages." The court rejected any definition of damages that included a technical distinction between legal and equitable forms of relief. *Id.* Recognizing that the court may take judicial notice of an insurance term's dictionary definition when that term is not defined by the policy, *Simpson v. State Mut. Life Assurance Co.*, 135 Vt. 554, 556, 382 A.2d 198, 200 (1977), the court turned to the following dictionary definition to determine the policy term's plain meaning: "Damages are defined as 'money claimed by, or ordered paid to, a person to compen-

sate for injury or loss caused by the wrong of the opposite party or parties.'" *Id.* (quoting Webster's New World Dictionary 348 (3d ed. 1988)); see also American Heritage Dictionary of the English Language 333 (8th ed. 1979) (defining "damages" as "Money paid or ordered to be paid as compensation for injury or loss"). The court then ruled that nothing in the definition limited "damages" only to those sums awarded by a court of law, and cited a number of federal and state courts that adopted a similar view based on the law in other jurisdictions. *Id.* at 725-26 nn. 10-11. After focusing its analysis on the expectations of an insured in Morrisville's position, the court held that "Morrisville, having insured itself against liability for 'damages,' could reasonably conclude that it was protected from financial loss without regard to the basis upon which its liability might technically be premised." *Id.* at 727. Moreover, the court acknowledged that other courts had adopted a more technical definition of the term "damages." *Id.* But the existence of a second reasonable definition created an ambiguity that, under our law, must be construed against the insurer. *Id.*; see *Peerless Ins. Co. v. Wells*, 154 Vt. 491, 494, 580 A.2d 485, 487 (1990) (stating rule that ambiguous terms must be construed against insurer and in favor of coverage).

¶ 27. The cases dealing with the "damages" issue in Wisconsin and other jurisdictions involved insureds seeking coverage for expenses incurred as a result of federal and state enforcement actions brought under certain provisions of CERCLA, 42 U.S.C. §§ 9601-9675 (West 1995), and its state equivalents. The statute empowers the federal government, acting through the EPA, to identify hazardous waste sites and take necessary actions to clean up those sites. *Id.* § 9604(a)(1). CERCLA allows the EPA to impose liability for response costs on a range of "responsible parties" that contributed in some way to the contamination. *Id.* § 9607(a). In administering site remediation, the EPA may either undertake cleanup itself and then sue responsible parties for reimbursement, 42 U.S.C. § 9607(a), or obtain a federal injunction mandating a responsible party to perform the cleanup under EPA's supervision, *id.* § 9606(a).

¶ 28. Vermont's Hazardous Waste Act (HWA), 1985, No. 70, parallels CERCLA in many relevant respects. See Developments in Vermont Law, *Successor Landowner Liability Under the Vermont Hazardous Waste Act of 1985*, 10 Vt. L. Rev. 487, 487-90 (1985) (discussing similarities between CERCLA and Vermont Hazardous Waste Act). As we discuss further below, the HWA is implicated in this

lawsuit because the June 9, 1995 PRP letter indicates that the State had placed plaintiffs' property on the Vermont Hazardous Sites List, designating it as #95-1792. Most significantly, the Hazardous Waste Act creates responsible party liability for the abatement of releases or threatened releases of hazardous materials, as well as the "costs of investigation, removal and remedial actions incurred by the state which are necessary to protect the public health or the environment." 10 V.S.A. § 6615(a)(1)-(4)(A)-(B). In addition, if responsible parties fail to adequately respond to state requests for appropriate remedial actions, the statute empowers the Agency of Natural Resources (ANR) to obtain a court order requiring such actions, and permits treble damages in the event of noncompliance with such an order. *Id.* § 6615(b).

## B.

¶ 29. Turning to the instant case, we conclude that the State did assert a claim for "damages" as defined above. The 1995 documents contained in the record include (1) the March 24 "Application for Emergency Order," (2) the May 9 "Application for Access Order Pursuant to 10 V.S.A. § 8005(b)(1)(c)," and (3) the June 9 "Request for investigative activities at Green Mountain Sanitation, Hardwick (VT DEC Site #95-1792)," referred to by plaintiffs as the "Potentially Responsible Party" letter. Of these, the trial court focused only on the March 24 application even though all three documents were submitted with plaintiffs' second motion. On appeal, Acadia has not argued that any of the documents is insufficient to initiate a "claim" or "suit" as those terms are used in the policy. See *CNA Ins. Cos.*, 172 Vt. at 324, 779 A.2d at 667 (construing the word "suit," as used in an insurance policy, to include administrative actions that are sufficiently adversarial and coercive in nature). Accordingly, we have reviewed them all to see if any one contains allegations that would satisfy the policy requirements.

¶ 30. Of the three purported 1995 "damages" claims plaintiffs have identified, we conclude that the June 9, 1995 PRP letter is a claim for "damages" sufficient to trigger Acadia's duty to defend under the policy. This conclusion is based on the fact that the letter requested plaintiffs to expend money because they were responsible for causing at least one, if not several, injuries to the state's environment by mishandling hazardous materials, and as a consequence were statutorily liable under § 6615 for the abatement of this injury. See *Village of Morrisville Water & Light Dep't*, 775 F. Supp. at 727 (holding that

"damages" include money ordered to be paid as part of environmental cleanup); see also *CNA Ins. Cos.*, 172 Vt. at 325, 779 A.2d at 668 (stating, in dicta, that liability imposed on an insured for "any cost of investigation or clean-up as required by [10 V.S.A. § 6615] would be damages covered by [a] policy" similar to the one at issue here). In the CERCLA context, the Wisconsin Supreme Court concluded, as we do here, that the term "damages" is broad enough to encompass these administratively-ordered costs. *Johnson Controls*, 2003 WI 108, ¶ 120. In the absence of a specific exclusion, a reasonable insured, reading the "as damages" language and assessing the coverage he is about to buy, would conclude that the policy provides indemnification for costs incurred by complying with a government order to take actions aimed at cleaning up contamination that he caused. See *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1206-07 (2d Cir. 1989) (interpreting similar policy by viewing operative language from perspective of reasonable businessman).

¶ 31. Moreover, plaintiffs operated a waste collection and recycling business; thus, it would have been reasonable for the parties to anticipate potential liability under myriad statutes that governed the handling of various sorts of waste. This is especially true where the coverage is under a "pollution liability hazard" defined to include all "'property damage' arising out of the discharge, release, or escape of 'pollutants' at or from a. premises you own, rent or occupy.'" The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and *waste. Waste includes materials to be recycled, reconditioned or reclaimed.*" (Emphasis added.)

¶ 32. As we stated above, the trial court's analysis inexplicably omitted any mention of the PRP letter even though plaintiffs referenced it in their second motion for partial summary judgment, and attached it to their statement of undisputed facts. At oral argument, plaintiffs' counsel conceded that his clients' appeal hinges on whether the PRP letter was a claim under the policy. The true import of the PRP letter can be understood, however, only in light of the averments and allegations contained in the affidavits accompanying the Application for Access that were also in the trial court record. These affidavits recite numerous instances of potential contamination on plaintiffs' property.

¶ 33. The following excerpts from these affidavits demonstrate the extent of the State's knowledge of plaintiffs' alleged pollution-causing

activities prior to the June PRP letter. In his affidavit, Water Quality Division Engineer Daniel Maxon summarized his on-site observations, indicating the ways in which plaintiffs' operations were "creating a serious threat to the water quality of the Lamoille River." Maxon described the conditions around a small stream that fed into the Lamoille River: "Within 20 feet of the stream ... a dumpster filled with mechanical parts ... was leaking heavy black machine oil, which was pooling in the stagnant water within 25 feet of the stream. At least one ditch existed through which stormwater from the Project Tract had recently drained into the stream." He concluded that "[w]ithout immediate installation of the erosion and stormwater control measures and cleaning-up of the Project Tract, I expect that the contaminated stormwater from the Project Tract will continue to flow into the Lamoille River." State Fisheries Biologist Eric Palmer described "several likely sources of soil and water contamination including an oily puddle from a dripping 'rolloff box' dumpster" close to the stream, and another "puddle of bright green fluid nearby which was speculated to be ethylene glycol anti-freeze or hydraulic fluid, and several large lead-acid batteries strewn about on bare ground with no overhead cover." In his affidavit, District Environmental Coordinator Charles Gallagher corroborated the other affiants' observations and also discussed how plaintiffs were illegally filling the Lamoille River's 100-year floodplain and floodway areas with construction and demolition debris. Based on the Application for Access and these affidavits, the district court concluded that there were reasonable grounds to believe that plaintiffs had violated 10 V.S.A. § 6610a* and that further examination of the property would aid in the violation determination. ANR personnel conducted the ordered examination of the property on May 15, 1995.

¶ 34. Following its March and May 1995 site investigations, the Department of Environmental Conservation's (DEC) Sites Management Section (SMS) added plaintiffs' property to the Hazardous Sites List.

> The Sites Management Section (SMS) provides state over-sight for the investigation and cleanup of properties where a release of a hazardous material has contaminated the

---

* The district court's order actually stated that it had reasonable grounds to believe that plaintiffs had violated "10 V.S.A. § 6610(a)"; however, this was likely a mistake. In 1987, the Legislature repealed 10 V.S.A. § 6610 and replaced it with § 6610a. 1987, No. 78, § 12.

environment including soils, groundwater, surface water and indoor air. The primary authority for this oversight can be found in 10 V.S.A. Section 6615. A list of properties being managed under this program is maintained by SMS and can be found in both list form and by geographic location.

State of Vermont Agency of Natural Resources Waste Management Division Homepage, Sites Management Section, at http://www.anr.state.vt.us/dec/wastediv/SMS/sites_management_section.htm. (last visited Dec. 14, 2004). Other than the PRP letter, the record does not contain any communication from the State to plaintiffs regarding its decision to list the property. Nonetheless, we can safely infer from the details in the PRP letter that the property was in fact listed. First, the letter was sent by an SMS official and SMS is the ANR section responsible for administering listed properties. *Id.* Second, the PRP letter indicated that the site had been listed as VT DEC Site #95-172. Contrary to Acadia's assertion, SMS's decision to list the site after two extensive site visits conducted by agency specialists is conclusive evidence that some contamination existed on the site, even if the full scope of the contamination and its various causes were as yet not fully defined.

¶ 35. Unlike the other 1995 documents that required plaintiffs only to provide the State with access to their property, the PRP letter requests plaintiffs to take the following actions, which necessarily required plaintiffs to expend money:

*Define the degree and extent of contamination to the soil.* This may be accomplished by soil borings, digging test pits, or performing a soil gas survey.

Determine the degrees and extent of contamination, if any, to groundwater. A sufficient number of monitoring wells should be installed in locations which will adequately determine if groundwater contamination exists on-site and, if so, define the severity of this contamination.

Perform an assessment of the site to determine the potential for sensitive receptors to be impacted by the contamination. This should include basements of adjacent buildings, nearby surface water, and any public or private drinking water wells which are located within the vicinity of the site. . . .

Determine the extent of disposed solid waste material on-site. This should include survey pits to delineate the boundary and depth of disposal throughout the site.

Determine the need for a long term treatment and/or monitoring plan if it is determined that significant contamination exists at the site.

Submit to the Sites Management Section (SMS) a summary report which outlines the work performed as well as providing conclusions and recommendations. Included should be detailed well logs, analytical data, a site map, an area map, a groundwater contour map and an estimate of the volume of solid waste material disposed on-site and a plan for removal and proper disposal if it is determined that it is necessary.

(Emphasis added.)

¶ 36. Though the actions ordered by the PRP letter are investigative in nature and are not cleanup costs per se, they fit within the compensation-for-loss-or-injury concept of damages we adopt here. As we recognized in *CNA Insurance Cos.*, ANR has a number of statutory powers and duties to safeguard the state's environment from releases of hazardous materials. 172 Vt. at 325, 779 A.2d at 667-68. When an unlawful release of hazardous materials occurs, as the State concluded it had at plaintiffs' property in 1995, ANR must expend sums drawn from the public treasury that are then lost to the State for other purposes. The Legislature, in § 6615, provided a mechanism to shift the costs incurred as a result of that loss onto the party who is responsible for the release of hazardous materials. The statute, including § 6615(b), the provision that created liability for investigative costs, was in existence when the parties contracted. Against this backdrop, the parties contracted to insure an operation that handled significant amounts of mixed solid and potentially hazardous materials. Accordingly, both parties could have reasonably expected that plaintiffs might incur liability under the statute.

¶ 37. The fact that the State chose to impose the investigative costs on plaintiffs in the first instance does not affect our conclusion that the PRP letter stated a claim that would have triggered Acadia's duty to provide plaintiffs with a defense to the State's enforcement action. As with agencies operating under CERCLA, ANR could have chosen to incur the investigation costs itself and then sued to recover those costs under § 6615(a)(4)(B), but instead SMS issued a PRP letter requesting specific investigative actions. See 10 V.S.A. § 6603(2) (authorizing

Secretary of ANR to "[i]ssue compliance orders as may be necessary to effectuate the purposes of this chapter and enforce the same by all appropriate administrative and judicial proceedings"). As one court stated:

> If the state were to sue in court to recover in traditional "damages", including the state's costs incurred in cleaning up the contamination, for the injury to the groundwater, defendant's obligation to defend against the lawsuit and to pay damages would be clear. It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs.

*U.S. Aviex Co. v. Travelers Ins. Co.*, 336 N.W.2d 838, 843 (Mich. Ct. App. 1983); cf. *Avondale Indus., Inc.*, 887 F.2d at 1206 (recognizing that private remedial efforts are quicker and less expensive than government sponsored program).

¶ 38. Because we have concluded that the trial court erred in basing its final judgment on an overly technical interpretation of the operative policy term "damages," we will remand for further proceedings on the outstanding issues in the case. Notwithstanding our conclusion on the "damages" issue, we are not ordering the entry of partial summary judgment for plaintiffs because the remaining issues at this stage, if resolved in Acadia's favor, could still warrant the entry of final judgment for Acadia. Notably, the issue of late notice still remains in the case.

### III. Late Notice

¶ 39. As an alternative grounds for denying coverage, Acadia also argues that plaintiffs forfeited coverage under the 1994-1995 policy by failing to promptly notify Acadia of the State's 1995 claims. Section IV of plaintiffs' policy requires plaintiffs to notify Acadia "as soon as practicable" in the event that a claim is made against plaintiffs. Plaintiffs concede that they waited roughly five years before notifying Acadia of the State's 1995 claims. Plaintiffs' failure to satisfy this condition does not, however, automatically result in a forfeiture of coverage under the 1995 policy.

¶ 40. In *Cooperative Fire Insurance Association v. White Caps, Inc.*, we held that an insurer must show prejudice from an insured's late notice before it can avoid its obligations under an insurance policy. 166 Vt. at 361-62, 694 A.2d at 38. We joined the majority of courts in requiring the insurer to show that the insured's late notice deprived the insurer of the main protections that the notice provision was meant to afford. *Id.* The notice provision allows the insurer to investigate the claim and take control over the proceedings early on, thereby maximizing the insurer's opportunity to avoid being placed in a "substantially less favorable position than it would have been in had timely notice been provided." *Id.* at 362, 694 A.2d at 38.

¶ 41. The late-notice question is complicated by plaintiffs' reliance on the retroactivity clause. Plaintiffs notified Acadia of the 2000 claim nine days after the State filed its complaint. Acadia does not dispute that this was sufficiently prompt notice of the 2000 claim. But the 2000 claim cannot be separated from the 1995 claim for prejudice purposes because both are based on the same "discharge, release or escape of pollutants." Acadia may, therefore, prevail on the late notice issue if it can show that late notice of the 1995 claim prejudiced it with respect to the 2000 claim.

¶ 42. The existence of prejudice is usually a question for the trier of fact. *Id.* at 363, 694 A.2d at 39. The trial court declined to rule on this question, deciding instead that Acadia was entitled to additional discovery on this issue. Accordingly, we will remand for further proceedings consistent with the trial court's order.

## IV. Property Damage

¶ 43. Our conclusion that the PRP letter was a claim for "damages" rests on the fact that DEC had listed plaintiffs' property on the Hazardous Sites List because the property was contaminated in some respects. This fact seems to foreclose any argument as to whether the State's claim for "damages" resulted from "property damage." The policy defines "property damage" as "[p]hysical injury to tangible property." The PRP letter and the affidavits accompanying the 1995 Access Order Application describe conditions on plaintiffs' property that fit within an insured's reasonable expectation as to what property damage so defined would be. Without restating them at length, the conditions included the discharge of hazardous materials such as petroleum products onto the property and into surrounding waterways, and the burial of mixed solid wastes on the property.

¶ 44. Plaintiffs have, however, raised questions about whether the type of property damage alleged in the State's 1995 claim brings the case within the ambit of the policy exclusion 2(j). The exclusion provides that the policy does not cover "[a]ny loss, cost or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants." Relying on *Agency of Natural Resources v. United States Fire Insurance Co.*, 173 Vt. 302, 307-10, 796 A.2d 476, 480-82 (2001), where we construed and ostensibly narrowed the scope of this same exclusion in another policy, plaintiffs argue that the exclusion does not apply to the type of government-directed remediation activity related to property damage inflicted on property other than the insured's, which in this case would be the groundwater and the Lamoille River. The trial court did not address this issue, and Acadia has not briefed it on appeal. Assuming that it becomes necessary when the late-notice issue is resolved, we will defer to the trial court to rule on this question with the benefit of more complete briefing and argument from the parties.

*Reversed and remanded.*