2010 VT 44

# Vermont Mutual Insurance Company v. Parsons Hill Partnership, Willard Group, Poulin Group and Adrienne Fortin

[1 A.3d 1016]

No. 08-509

Present: **Dooley, Johnson, Skoglund and Burgess, JJ., and Crawford, Supr. J., Specially Assigned**

Opinion Filed June 4, 2010

81

*Leo A. Bisson* and *Joslyn L. Wilschek* of *Primmer Piper Eggleston & Cramer PC*, Montpelier, for Plaintiff-Appellee.

*John Paul Faignant* of *Miller & Faignant, P.C.*, Rutland, for Defendants-Appellants The Willard Group.

*Lisa Chalidze*, Benson, and *Eugene F. Rakow* of *Rakow & Volz, P.C.*, Rutland, for Defendants-Appellants Parsons Hill Partnership, William Rooney and Catherine Rooney.

*John J. Welch, Jr.*, Rutland, for Defendants-Appellants Poulin Group and Adrienne Fortin.

¶ 1. **Dooley, J.** Plaintiff insurance carrier, Vermont Mutual Insurance Company, sought a declaration in Washington Superior Court that landlord's liability insurance policies do not cover tenants' claims for breach of an implied warranty of habitability. The trial court granted insurance carrier's motion for summary

judgment on the issue. Defendants Parsons Hill Partnership,[1] Willard Group,[2] Poulin Group,[3] and Adrienne Fortin[4] appeal on the ground that the court erred in construing the applicable insurance policies. We affirm.

¶ 2. Landlord Parsons Hill Partnership owns an apartment complex for low-income families in Castleton, Vermont. In 1983, landlord received notification from the Vermont Department of Health that tests had detected unsafe levels of the toxin Perchloroethylene (PCE) in the apartment complex's water system and that the water had been assigned "No Drink" status. The cause turned out to be a faulty plastic lining in the storage tank of the water system. Despite the warning, landlord took no remedial steps and did not notify its tenants of the water contamination. In 1997, one of the tenants learned of the contamination notices issued by the Department of Health while conducting internet research on an unrelated matter for her employer. Shortly thereafter, tenants filed a lawsuit for damages in Rutland Superior Court against landlord and various other parties. This underlying litigation has been ongoing for twelve years and was settled against all parties except the landlord. As part of the settlement, tenants' claims were reduced to one, alleging breach of the common law warranty of habitability. In an earlier appeal, this Court held, among other things, that tenants' common law claim for breach of the implied warranty of habitability was not preempted by the Residential Rental Agreements Act, 9 V.S.A. §§ 4451-4468, and therefore could be asserted against landlord in the trial court. *Willard v. Parsons Hill P'ship*, 2005 VT 69, ¶ 27, 178 Vt. 300, 882 A.2d 1213.

¶ 3. Landlord held a general comprehensive liability insurance policy (the Policy) from insurance carrier for each of the following periods: 1987-1990, 1990-1993, 1993-1996, 1996-1999, and 1999-2001. After receiving tenants' complaint, landlord notified insurance carrier and requested assistance with defending the lawsuit. Insurance carrier agreed to defend on behalf of landlord, while

---

[1] The Partnership is joined by two of the partners, William and Catherine Rooney.

[2] The Willard group is a group of tenants in the apartment complex owned by Parsons Hill Partnership.

[3] The Poulin group is a group of tenants in the apartment complex owned by Parsons Hill Partnership.

[4] Adrienne Fortin is a tenant in the apartment complex owned by Parsons Hill Partnership.

reserving the right to later argue that the Policy did not cover tenants' claims. And, indeed, in January 1998, insurance carrier filed the present declaratory judgment action, contending that tenants' claims fell outside the scope of the Policy and naming landlord and tenants as defendants.

¶ 4. The Policy provides three relevant forms of liability coverage. Coverage A provides coverage for bodily injury and property damage caused by an occurrence during the policy period. Under defendants' theories, the coverage limit exceeds four million dollars with respect to the claims in the underlying suit. This coverage contains an exclusion for bodily injury or property damage caused by "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." Coverage A is a standard part of comprehensive general liability insurance.

¶ 5. Coverage B provides coverage for personal injury or advertising injury caused, among other things, by an offense arising out of the business of the insured. Again, under defendants' theories, the coverage limit exceeds four million dollars with respect to the claims in the underlying suit. There is no pollution exclusion with respect to this coverage. Coverage B is also a standard part of comprehensive general liability insurance and is often called the broad form endorsement.

¶ 6. Coverage D was added by a pollution endorsement. It provides coverage for bodily injury and property damage caused by an occurrence if the claim was made during the policy period and arose out of "discharge, release or escape of pollutants" at premises owned by the insured. The aggregate pollution liability coverage limit is one million dollars. This coverage is not standard.

¶ 7. From the beginning landlord and tenants argued that Coverage D did not apply because their damages were not caused by pollutants within the meaning of the pollution endorsement. Instead they contended that both Coverage A and B applied. This position was rejected in August 1999 when the Washington Superior Court granted insurance carrier's motion for partial summary judgment in the declaratory judgment action. The court held that any claims relating to contaminated water were claims concerning "pollutants" and fell within the scope of the pollution endorsement, as well as the pollution exclusion from Coverage A.

¶ 8. In 2003, tenants and all of the defendants except for landlord reached separate settlement agreements with respect to

the initial 1997 action. These settlement agreements required tenants to dismiss all causes of action other than their breach-of-warranty claim against landlord. In return, tenants received $3,005,000.

¶ 9. Finally, in November 2008, the trial court issued a final decision and order granting summary judgment to insurance carrier in the declaratory judgment action. This decision reaffirmed the trial court's 1999 determination that the breach-of-warranty claim was a claim concerning "pollutants" and therefore subject to the pollution endorsement and the pollution exclusion from Coverage A. The court also ruled that the exclusive coverage for damages from "pollutants" came from the pollution endorsement and could not come from any other coverage in the policy. Thus, the court ruled that if the pollution endorsement did not provide coverage for tenants' claim, the policy provided no coverage. The court further concluded that there was no coverage under the pollution endorsement, and for the same reason none under Coverage A, because tenants sought damages neither for bodily injury nor property damage as the terms were defined under the Policy. Finally, the court concluded as an additional ground for its decision that tenants had not alleged personal injury as defined in Coverage B, and, therefore, landlord had no coverage from that part of the policy. Concluding that there was no coverage under any of the coverage sections, the court thus granted insurance carrier's motion for summary judgment. Defendants appeal from both the 1999 and 2008 summary judgments, contending that the court interpreted the Policy incorrectly and that the Policy insures against tenants' warranty-of-habitability claim.

¶ 10. We review a decision granting summary judgment de novo, giving the nonmoving party the benefit of all reasonable doubts and inferences. *Stamp Tech, Inc. v. Lydall/Thermal Acoustical, Inc.*, 2009 VT 91, ¶ 11, 186 Vt. 369, 987 A.2d 292. Summary judgment is appropriate "where there are no genuine issues of material fact and any party is entitled to judgment as a matter of law." *Turner v. Roman Catholic Diocese of Burlington*, 2009 VT 101, ¶ 23, 186 Vt. 396, 987 A.2d 960. This is primarily an insurance contract interpretation case, and there are no genuine issues of material fact.

¶ 11. We make two points at the outset of this decision. First, elements of this case are present in a large number of appellate

decisions from around the country because the language of Coverage A, including the pollution exclusion, and Coverage B appear in virtually all of the commercial liability policies issued by insurance carriers in the United States. See *New Castle County v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 243 F.3d 744, 747 (3d Cir. 2001) (noting that meaning of phrase central to this case from Coverage B has "generated hundreds of lawsuits"); see generally 20 E. Holmes, Appleman on Insurance 2d §§ 129-131 (2002) (describing terms of Coverage A and Coverage B). What differs from most of the other cases is the presence of Coverage D, the Vermont pollution endorsement, and the single liability claim asserted against landlord for breach of warranty of habitability. Thus, while some of the many decisions are helpful, as the following discussion shows, others are not helpful under the unique circumstances of this case.

¶ 12. Second, we face an initial challenge to determine what issues are before us by virtue of the appeal. The trial court observed that the "posture and context ha[ve] allowed the arguments here to become essentially untethered from the defining policy language and have tended to obscure the reality, at least in this court's view, that the dispositive issue in this case is now relatively simple and straight-forward." We agree. Defendants have raised a number of discrete issues, but failed to relate them to the logic of the court's decisions. As a result, the issues appear like hypothetical questions of law, and we often do not know what rulings of the court defendants challenge. This leads us to start with a roadmap, as much as we can create one, through the issues.

¶ 13. We understand that the trial court made the following rulings with respect to the three forms of coverage:

(1) With respect to Coverage A, there is no coverage because (a) the pollution exclusion applies, and (b) the remaining count of the underlying litigation does not involve damages for "bodily injury" or "property damage."

(2) With respect to Coverage B, there is no coverage because (a) Coverage D is the only part of the policy to cover damage claims from pollutants, and the water adulterated with PCE was a pollutant, and (b) the

underlying litigation does not involve damages for "personal injury" as that term is defined in the Policy.

(3) With respect to Coverage D, the pollution endorsement does apply because the water adulterated with PCE is a "pollutant," but there is no coverage because the remaining count of the underlying litigation does not involve damages for "bodily injury" or "property damage." Additionally, the one million dollar aggregate damage limit would control any claim involving a "pollutant."

¶ 14. Defendants make the following arguments in their briefs:

(A) The trial court failed to consider the reasonable expectation of the insured as affecting insurance coverage.

(B) The trial court erred in applying an overbroad interpretation of "pollutant."

(C) The trial court erred in refusing to permit defendants reasonable discovery with respect to insurance carrier's representations to the regulators on the scope of pollution coverage.

(D) The trial court misinterpreted the Policy as applied to breach of the warranty of habitability.

(E) The trial court was without a factual basis to deny coverage without a one million dollar aggregate coverage limit.

(F) The trial court failed to find a waiver of coverage defenses by allowing the coverage department to access information in the hands of the claims adjustor, including information protected by attorney-client privilege.

(G) The trial court ignored the holding in *Beltway Management Co. v. Lexington-Landmark Insurance Co.*, 746 F. Supp. 1145 (D.D.C. 1990) (mem.).

We have carefully examined the briefs and have concluded that defendants' arguments (A) and (F) apply to all rulings of the trial court; arguments (B) and (C) relate to the pollution endorsement and particularly the ruling that the PCE adulterated water was a

pollutant as defined in the endorsement; argument (E) relates to the ruling that the coverage limit in the pollution endorsement applies to any coverage under the Policy; and arguments (D) and (G) relate to the trial court's ruling that there is no coverage under Coverage B because the claim does not seek damages for a personal injury.

¶ 15. We agree with insurance carrier that defendants have made no direct argument on appeal challenging the trial court's decision that there is no coverage under either Coverage A or D, the pollution endorsement, because tenants' remaining claim in the underlying action does not seek damages for bodily injury or property damage. In the absence of such a challenge, we must affirm the court's conclusion that there is no coverage under either Coverage A or D, unless we reverse on one of the two general arguments, arguments (A) or (F).[5] In any event, we do not need to reach defendants' arguments (B) or (C), with respect to whether the water adulterated with PCE was a pollutant within the definition of the pollution endorsement, as our ruling either way on these arguments cannot affect the result of this appeal.

¶ 16. Apart from defendants' general arguments, we are left only with arguments with respect to Coverage B. As we stated above, the trial court gave two alternative grounds for its conclusion that there was no coverage under Coverage B: (a) the tenants' claim against landlord did not seek personal injury damages as defined under Coverage B; and (b) the exclusive coverage for damages caused by a pollutant, including the PCE adulterated water, is provided by Coverage D with its one million dollar aggregate limit. Defendants must convince us that both of these rulings are wrong. We start with the ruling that the underlying litigation does not involve a claim resulting in personal

---

[5] In response to insurance carrier's statement that defendants did not contest on appeal the rulings that the underlying action did not seek damages for bodily injury or property damage, counsel for the Poulin defendants added in its reply brief an argument contesting those rulings. He asserted that he could do so because insurance carrier made an argument on the point. See *Condosta v. Condosta*, 139 Vt. 545, 547, 431 A.2d 494, 496 (1981) (per curiam) (observing that it is not purpose of reply brief to raise issues not briefed in either appellant's or appellee's brief). Whether raised by appellee or not, we have no obligation to consider issues raised for the first time by an appellant in a reply brief. See *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 1 n.2, 176 Vt. 356, 848 A.2d 310. We choose not to address the reply brief issue in this case.

injury as defined in Coverage B. Because we conclude that this ruling was correct, we do not reach the alternative ground for the court's decision.

¶ 17. Coverage B provides coverage for personal injury or advertising injury caused, among other things, by an offense arising out of the business of the insured. Only the coverage for "personal injury" is relevant. The endorsement defines "personal injury" as:

> injury, other than "bodily injury" arising out of one or more of the following offenses:
>
> a. False arrest, detention or imprisonment;
>
> b. Malicious prosecution;
>
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;
>
> d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or
>
> e. Oral or written publication of material that violates a person's right of privacy.

Defendants argue that the underlying lawsuit against landlords is a suit for personal injuries under subsection (c) above. The trial court rejected defendants' arguments for two reasons. First, the court ruled that the remaining claim in the underlying suit — breach of the implied warranty of habitability — is a form of breach of contract. In these circumstances, the "measure of damages [is] the difference between the value of the dwelling as warranted and the value of the dwelling as it exists in its defective condition." *Hilder v. St. Peter*, 144 Vt. 150, 161, 478 A.2d 202, 209 (1984). In addition, tenants may recover damages "for [their] discomfort and annoyance arising from the landlord's breach of

the implied warranty of habitability." *Id.* Absent negligence, tenants may not recover damages for "personal injuries" caused by breach of the warranty. *Favreau v. Miller*, 156 Vt. 222, 230, 591 A.2d 68, 73 (1991). The court held that the damages the tenants could recover do not fall under the heading of personal injuries.

¶ 18. The court's second reason relates more closely to the specific language of Coverage B. Defendants allege that the claimed conduct constituted a "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a . . . dwelling," the third "offense" in the list in Coverage B. The court rejected that argument, holding that "[t]here was no constructive eviction here; . . . none of the tenants ever actually moved out, i.e., no involuntary 'eviction,' or loss of tenancy actually resulted" and "the toxic contamination of their drinking water [did not] materially invade, or compromise in any way their rights to exclusive possession of their leased premises."

¶ 19. We note that the United States Bankruptcy Court for the District of Vermont, in a virtually identical case, adopted the same rationale as the trial court here for denying coverage for an inadequate water and sewerage claim under identical policy language. *In re Aberdeen 100, Inc.*, Nos. 94-10599 & 94-1060, 1995 WL 447341, at **11-12 (Bankr. D. Vt. July 21, 1995). In that case the bankruptcy court, like the trial court here, noted that there was no eviction or wrongful entry alleged. *Id.* The court held that the problems with water and sewage did not affect the right of occupancy and application of the policy language to the circumstances of the case "would stretch the language . . . beyond its plain and unambiguous meaning." *Id.* at *12.

¶ 20. In evaluating the applicability of Coverage B, it is important to emphasize that while Coverage B is labeled as coverage for personal injury damages, it is really coverage based on underlying claims of liability involving certain defined offenses. As one federal district court explained, "[p]ersonal injury liability is a theory-based insurance coverage. It defines its coverage in terms of offenses, or theories of liability, not in terms of the injury sustained by the plaintiff." *Great N. Nekoosa Corp. v. Aetna Cas. & Sur. Co.*, 921 F. Supp. 401, 416 (N.D. Miss. 1996). The court distinguished this coverage from general liability insurance, which defines its coverage in terms of the injury sustained and not the theory of liability. *Id.*

■ ¶ 21. We agree with the trial court that tenants' theory of landlord's liability does not create coverage under Coverage B. As the trial court observed, the underlying claim does not involve eviction or wrongful entry. Thus, to claim an "offense" under Coverage B, the claim must involve an invasion of the tenants' private right of occupancy. When interpreting an insurance contract, we rely principally on the plain, ordinary, and popular meaning of the disputed terms. *Hardwick Recycling & Salvage, Inc. v. Acadia Ins. Co.*, 2004 VT 124, ¶ 23, 177 Vt. 421, 869 A.2d 82; *Agency of Natural Res. v. U.S. Fire Ins. Co.*, 173 Vt. 302, 308, 796 A.2d 476, 480 (2001). When a provision is ambiguous or may reasonably be interpreted in more than one way, then we will construe it according to the reasonable expectations of the insured, based on the policy language. *Hardwick Recycling*, 2004 VT 124, ¶ 23. However, "we will not deprive the insurer of unambiguous terms placed in the contract for its benefit." *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 9, 177 Vt. 215, 862 A.2d 251.

■ ¶ 22. In our view, the breach-of-warranty claim does not involve an offense as that term is used in Coverage B. The language of the Policy lists five offenses. With the possible exception of an invasion of the private right of occupancy — the language on which defendants primarily rely — all involve recognized torts. For that reason, most courts that have considered the list in similar or identical contexts have held that the word "offense" is used as a synonym for tort. See, e.g., *Am. Guar. & Liab. Ins. Co. v. 1906 Co.*, 273 F.3d 605, 617 (5th Cir. 2001) ("[T]he word [offense] in this context conveys the same meaning as 'tort.' "). Thus, Coverage B is generally described as coverage for torts. See, e.g., *Butler v. Clarendon Am. Ins. Co.*, 494 F. Supp. 2d 1112, 1133 (N.D. Cal. 2007) (coverage for invasion of right of private occupancy is for "tort claims arising out of the interference with an interest in real property" (emphasis omitted)); *State Farm Fire & Cas. Co. v. Metro. Mgmt.*, No. 1:07-CV-00176-HG-KSC, 2007 WL 4157148, at *11 (D. Haw. Nov. 23, 2007) (Coverage B equivalent is for "dignitary torts"); *CGU Ins. v. Tyson Assocs.*, 140 F. Supp. 2d 415, 420 (E.D. Pa. 2001) (Coverage B is coverage arising out of enumerated torts); *Town of Epping v. St. Paul Fire & Marine Ins. Co.*, 444 A.2d 496, 497 (N.H. 1982) (Coverage B equivalent provides coverage for "specified tort claims"); *O'Brien Energy Sys., Inc. v. Am. Employers' Ins. Co.*, 629 A.2d 957, 964

(Pa. Super. Ct. 1993) ("The personal injury endorsement extends liability coverage to the specific torts there enumerated."); *S.C. State Budget & Control Bd. v. Prince*, 403 S.E.2d 643, 647 (S.C. 1991) (noting personal injury coverage specifically insures against "intentional torts"). Because an "offense" means a tort as enumerated in the specific list, it does not include a breach of contract. See *Stanford Ranch, Inc. v. Md. Cas. Co.*, 89 F.3d 618, 628 (9th Cir. 1996) (under California law, coverage for "other invasion of the right of private occupancy" is limited to tort and does not include contract claims); *Lopez & Medina Corp. v. Marsh USA, Inc.*, 694 F. Supp. 2d 119, 127-28 (D.P.R. 2010) (personal injury coverage offenses "all invoke torts of one kind or another, but not once a contractual claim" and are "tortious offenses against the person"); *Toombs NJ Inc. v. Aetna Cas. & Sur. Co.*, 591 A.2d 304, 307 (Pa. Super. Ct. 1991) (coverage for "invasion of the right of private occupancy" does not include claim "for damages sounding in contractual breach"). We also agree with the United States Bankruptcy Court for the District of Vermont and the trial court that construing a breach of warranty as an "invasion" stretches the language of the Policy "beyond its plain and unambiguous meaning." *Aberdeen 100*, 1995 WL 447341, at *12.

¶ 23. Our holding that the personal injury coverage in Coverage B does not extend to the contractual breach-of-warranty claim is also consistent with our treatment of contractual breach claims under general liability provisions. In *City of Burlington v. National Union Fire Insurance Co.*, 163 Vt. 124, 655 A.2d 719 (1994), we considered whether a general liability policy obligated the insurance carrier to defend claims that the City of Burlington Electric Department breached contracts by failing to purchase wood chips used for fuel in its generation plant. Relying in part on one of the cases cited above, *Toombs NJ*, we noted the mismatch between the purpose of the general liability policy and the kind of claim for which coverage was sought. *Id.* at 130, 655 A.2d at 722. Specifically, we recognized that "we would distort the purpose of the liability insurance policy in this case by applying it to commercial litigation arising out of Burlington's breach of a contract to purchase a specified quantity of wood chips." *Id.* at 130, 655 A.2d at 722-23. We conclude that the policy rationale for the *City of Burlington* case applies equally here.

¶ 24. We next address defendants' specific argument that we should follow the memorandum decision in *Beltway*, 746 F. Supp.

1145. Indeed, the last of defendants' arguments was that the trial court erred in ignoring this decision. The *Beltway* decision held that an insurance carrier had a duty to defend its insured in an underlying action in which the insured was sued for violating the implied warranty of habitability of its tenants. The court held that the claim involved personal injury coverage as an "invasion of the right of private occupancy." *Id.* at 1152-53. Its main rationale was that an invasion of a right of private occupancy must mean something more than a wrongful entry or eviction; otherwise the words would be superfluous. *Id.* at 1154. Thus, the court held that the "invasion" language covered a "broad range of claims against landlords," including "claims of breach of the warranty of habitability." *Id.* at 1153.

¶ 25. *Beltway* is narrowly distinguishable because it is a duty-to-defend case. More broadly, it appears to treat breach of warranty as a tort claim: noting that under *George Washington University v. Weintraub*, 458 A.2d 43, 47 (D.C. 1983), the warranty of habitability in the District of Columbia requires a landlord to "exercise reasonable care to maintain rental premises." *Beltway*, 746 F. Supp. at 1149. While we do not disagree with its analysis of differences between wrongful eviction, wrongful entry, and invasion of the private right of occupancy, we find that it fails to recognize the limitation of coverage involved in the concept of an "offense." Accordingly, we decline to follow that decision.

¶ 26. As we stated above, because we conclude that there is no coverage under Coverage B, we do not reach defendants' argument that the court erred in ruling that the sole possible coverage for a pollution claim was pursuant to Coverage D.

¶ 27. We are left only with defendants' general arguments that apply to all aspects of coverage. Defendants argue that landlord had a reasonable expectation of coverage and that this expectation should trump any coverage limitations. An affidavit from the owners of the Parsons Hill Partnership stated that "we believed that the liability insurance policy which we purchased from Vermont Mutual Insurance Company covered and protected against any and all claims that the tenants of Parsons Hill Housing Project might bring against us or against Parsons Hill Partnership out of alleged defective or dangerous conditions concerning the leased premises." Defendants argue that the affidavit should control over the policy language.

■ ¶ 28. Our decisions recognize the reasonable expectation of the insured in interpreting insurance coverage policy provisions. Thus, as we recently stated in *Towns v. Northern Security Insurance Co.*, 2008 VT 98, ¶ 21, 184 Vt. 322, 964 A.2d 1150, "Vermont law . . . requires that policy language be accorded its plain, ordinary meaning consistent with the reasonable expectations of the insured, and that terms that are ambiguous or unclear be construed broadly in favor of coverage." We similarly explained in *State Farm Mutual Automobile Insurance Co. v. Roberts*, 166 Vt. 452, 461, 697 A.2d 667, 672 (1997), that the "reasonable expectations of the parties are important in considering the scope of coverage," because of the adhesive nature of the contracts. In light of such expectations, "we must consider the policy in its entirety with an eye toward its general purpose." *Id.* at 461, 697 A.2d at 673. But apart from circumstances where an agent of the insurance carrier promises specific coverage, we have not held that the expectations of an insured can control over unambiguous policy language. Thus, we do not give controlling weight to the affidavit of the insured landlord.

■ ¶ 29. Defendants argue particularly that landlord would not have known the difference between claims based on a warranty of habitability and those based on tort theories. We recognize that when claims are couched in legal terminology, laypersons cannot be expected to fully comprehend the elements of those claims or the significance of different elements. Landlord is, however, engaged in a business, and it is not unreasonable to expect a need for professional advice to optimize insurance coverage. Indeed, in this case, the unique pollution coverage is an instance where specific coverage needs have been recognized beyond the standard policy provisions. See generally *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 754 F. Supp. 358, 363-65 (D. Vt. 1990) (describing history of pollution endorsement). The standard policy provisions, particularly the provision of Coverage B at issue in this case, have been the subject of many court decisions, and their limitations can be readily determined. We cannot find any expectation of coverage under Coverage B to be reasonable given the unambiguous language of the policy.

■ ¶ 30. Finally, defendants argue that we should reverse because insurance carrier's coverage staff improperly used confidential information obtained by insurer-supplied defense counsel

from his client, landlord, to deny coverage. The trial court rejected this argument, finding no facts in the record from which it could infer that insurance carrier's staff had improper access to confidential information "which would be of any use, or benefit at all in this coverage litigation." We concur in that assessment, including consideration of the evidence specifically addressed by landlord. The issue is not whether insurance carrier properly organized its staff and maintained a wall between coverage counsel and defense counsel for landlord. Instead, the issue is whether its organization could have had any effect on the coverage determination. The only remaining coverage issue is purely one of law, and insurance carrier could not have obtained from defense counsel any information that could have any effect on whether coverage existed.

*Affirmed.*